James D. HODGSON, Secretary of Labor, U. S. Department of Labor, Plaintiff-Appellee,

v.

The BEHRENS DRUG COMPANY, Defendant-Appellant.

No. 72–1680.

United States Court of Appeals, Fifth Circuit.

Feb. 12, 1973.

As Amended March 7, 1973.

---

Tracy Crawford, Tyler, Tex., Wilford W. Naman, Waco, Tex., for defendant-appellant.

Richard F. Schubert, Sol. of Labor, U. S. Dept. of Labor, Washington, D. C., M. J. Parmenter, Regional Sol., U. S. Dept. of Labor, Truett E. Bean, U. S. Dept. of Labor, Dallas, Tex., Carin Ann Clauss, Donald S. Shire, Anastasia T. Dunau, U. S. Dept. of Labor, Washington, D. C., for plaintiff-appellee.

Before RIVES, THORNBERRY and GOLDBERG, Circuit Judges.

RIVES, Circuit Judge:

In this case brought by the Secretary of Labor under the Fair Labor Standards Act, the district court found that Behrens Drug Company (hereinafter Behrens) discriminated against certain female employees by compensating them at a lower rate than their male counterparts. Behrens appeals, arguing that each contested male-female wage differential rests on legitimate grounds—that the males involved are either participating in a bona fide training program or performing unequal work.

The Equal Pay Act of 1963, 29 U.S.C. § 206(d)(1),[1] an amendment to the Fair Labor Standards Act of 1938, prohibits sex-based wage discrimination between employees performing equal work under similar conditions. The Secretary of Labor, commissioned champion of the female worker by the Act,[2] brought this action on behalf of several female employees in Behrens' Tyler, Texas, warehouse.

The district court, after finding that Behrens breached the Equal Pay Act, en-

---

1. "(d)(1) No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: *Provided*, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee."

2. 29 U.S.C. § 206(d)(3) provides the authority for the Secretary to act on behalf of the workers by stating that,

 "For purposes of administration and enforcement, any amounts owing to any employee which have been withheld in violation of this subsection shall be deemed to be unpaid minimum wages or unpaid overtime compensation under this chapter."

And 29 U.S.C. § 216(c) empowers the Secretary to bring civil action on behalf of employees to recover such "minimum wages or unpaid overtime compensation."

tered judgment enjoining Behrens from further violations of the Act's equal pay requirements and restraining the continued withholding of $17,423.99 in back wages found due as a result of Behrens' violations. The district court ruled that Behrens paid four separate categories of female workers a discriminatorily low wage. Behrens appeals the ruling as to each category.

## I. ORDER CLERKS

For many years Behrens has employed females in its Tyler division warehouse as "order clerks." The principal responsibilities of an "order clerk" include: arranging merchandise on the warehouse shelves, filling customer orders by gathering the requested stock and sending it along to the "checker," and restocking the shelves. [App. 211.] Behrens admitted and the district court found that certain male employees, designated "sales trainees," performed work substantially equal to that of the female "order clerks" during the period in question. [App. 211.]

Behrens acknowledged that the male "sales trainees" were paid a higher wage than "order clerks" for doing the same work, but sought to justify this wage discrepancy as based on a bona fide training program, purportedly constituting a legitimate distinguishing factor other than sex.

29 U.S.C. § 206(d)(1) recognizes four exceptions to the general prohibition of disparate wage payments between workers of the opposite sex. The first three

exceptions to the Equal Pay Act are specific (a seniority system, a merit system, and a system which measures earnings by quantity or quality of production), but the last is stated in general terms— "any other factor other than sex," 29 U.S.C. § 206(d)(1)(iv). 29 C.F.R. § 800.148,[3] the Secretary's Interpretative Bulletin, expressly designates bona fide training programs as one factor other than sex which may validly produce a male-female wage gap. Behrens contends that its male "sales trainees" are all participants in a bona fide training program, providing a legitimate basis for their higher wage rate than that of female "order clerks."

In order to verify the structure of its training program, Behrens offered the testimony of its president, treasurer, Tyler division manager, and four salesmen.

Behrens' president, W. Lacy Clifton, admitted that his company's sales training program has never included a woman. [App. 553.] He sought to explain the program's male dominance by reference to its origin:

"I would say that when this program was started [1946] that females were never considered as suitable for traveling. . . . You think about putting a female out on a job where she might have a flat tire at night." [App. 546.]

In recent years, Clifton claimed, inclusion of females in the sales training program has been considered, and one woman, Annette Neeley, was offered a

---

3. "§ 800.148 *Examples—training programs.*
 "Employees employed under a bona fide training program may, in the furtherance of their training, be assigned from time to time to various types of work in the establishment. At such times, the employee in training status may be performing equal work with non-trainees of the opposite sex whose wages or wage rates may be unequal to those of the trainee. Under these circumstances, provided the rate paid to the employee in training status is paid, regardless of sex, under the training program, the differential can be shown to be attributable to a factor other than

sex and no violation of the equal pay standard will result. Training programs which appear to be available only to employees of one sex will, however, be carefully examined to determine whether such programs are, in fact, bona fide. In an establishment where a differential is paid to employees of one sex because, traditionally, only they have been considered eligible for promotion to executive positions, such a practice, in the absence of a bona fide training program, would be a discrimination based on sex and result in a violation of the equal pay provisions, if the equal pay standard otherwise applies."

sales job on a temporary basis. Miss Neeley turned the job down for reasons which are contested.[4] However, Clifton admitted that present company policy calls for active solicitation of young men as sales trainees, but not women, and Miss Neeley, while she was offered a sales job, was not offered a position as a sales trainee. [App. 554.]

The district court found and both parties, with minor exceptions, agree that the Behrens' sales training program has the following characteristics:

1) No written or formal plan of training;

2) a regular system of rotation through each of the different warehouse jobs with progression to the next position based on satisfactory familiarity with the position before it;

3) no specific identifiable point of termination;[5]

4) sales trainees are informed upon hiring that they are entering a training program;

5) some formal sales training, including meetings, study of sales literature and travel with current salesmen, is provided upon reaching the final job in rotation—the city order desk. [Although the district court made no express finding on this point, testimony to that effect appears at App. pp. 580–582.]

In addition, uncontradicted testimony established that a male trainee carries out productive work and rotates through the training program without regard to personnel needs, except that the final advance to the position of salesman is contingent upon an opening in that slot. [App. 561, 562.]

In the seminal case interpreting the bona fide training program exception to the Equal Pay Act, Shultz v. First Victoria National Bank, 5 Cir. 1969, 420 F. 2d 648, this Court ruled that two separate male-dominated "executive training programs" for bank tellers did not constitute a factor other than sex which would permit payment of lower wages to female tellers not included in the training programs. Those particular programs were found to be merely "post-event justifications for disparate pay to men and women from the commencement of employment up through advancement." *Shultz, supra,* at 655.

The elements of the two bank training programs in *Shultz,* which that court listed as conclusive of their fatal imprecision, were:

1) Employees were not hired with the knowledge that they were trainees.

2) The plans were not in writing.

3) The "rotation" of trainees through the various bank positions did not follow any definite sequence, but depended on personnel needs.

4) No formal instruction was offered at either bank.

5) Neither program had ever included a woman.

6) Advancement to the next position was unpredictable and sporadic.

Faced with these amorphous bank training plans and strongly influenced by the fact that both programs excluded females, the *Shultz* court reasoned that judicial recognition of such programs would allow "the exception will swallow

---

4. App. p. 438. The Secretary contends that Miss Neeley refused the job because she was not offered an increase in pay or the incentive of the normal commission arrangement, while Behrens argues that pay was never discussed.

5. Behrens concedes that its training program lasts for an indefinite period of time, but argues that it ends at an identifiable point—when familiarity with all the warehouse jobs is satisfactorily accomplished

and a sales position opens. This circuitous reasoning fails to focus upon an identifiable termination point. Theoretically, a job slot cannot be filled until the training program is successfully completed. Thus, to say that the program ends when the job slot opens implies that completion of the program is not a prerequisite to beginning a sales job. If that is true, then the program's validity is cast in a questionable light.

the rule" and effectively undermine the congressional purpose for passing the Equal Pay Act.[6]

A cursory comparison of the training programs belatedly offered as justification for the unequal pay in *Shultz* with the program at issue here reveals that the latter is far more concrete than were the former. The Behrens training plan is not a post-event justification. Behrens' sales trainees enter employment with explicit knowledge of their training status. They rotate through the initial warehouse positions without regard to personnel needs, and they receive some formal sales training while serving as city order clerks.

Yet, because of the crucial weaknesses in the Behrens training program, which will be treated subsequently, coupled with the genuine concern for women's rights which prompted the Act,[7] we feel that the principles enunciated in *Shultz* are applicable here.

The Behrens sales training program suffers from two principal weaknesses.

First, the Behrens trainee's ultimate advancement to the position of salesman depends on, not only satisfactory completion of the training program, but also the fortuitous event of a sales opening. In other words, the termination point of the program is not determinable prior to its actual occurrence, and that termination point is subject to the vagaries of the business climate and the company's personnel needs.

Second, the Behrens program is male dominated. No woman has ever participated in the program. While it is true that the issue of whether trainee positions should be open to women is a question to be ultimately resolved only in an action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e (1970), in the manner pursued in Diaz v. Pan American World Airways, Inc., 5 Cir. 1972, 442 F.2d 385; see Hodgson v. Golden Isles Convalescent Homes, 5 Cir. 1972, 468 F.2d 1256, it is also true that "training programs which appear to be available only to employees of one sex

6. "Sec. 2. (a) The Congress hereby finds that the existence in industries engaged in commerce or in the production of goods for commerce of wage differentials based on sex—
 (1) depresses wages and living standards for employees necessary for their health and efficiency;
 (2) prevents the maximum utilization of the available labor resources;
 (3) tends to cause labor disputes, thereby burdening, affecting, and obstructing commerce;
 (4) burdens commerce and the free flow of goods in commerce; and
 (5) constitutes an unfair method of competition.
 "(b) It is hereby declared to be the policy of this Act, through exercise by Congress of its power to regulate commerce among the several States and with foreign nations, to correct the conditions above referred to in such industries."
 Public Law 88–38 (1963), 77 Stat. 56.

7. "Representative Donahue speaking in behalf of this legislation characterized the need for the Equal Pay Act to eliminate these assumptions:
 "'We all realize that the origin of the wage rate differential for men and women performing comparable jobs is the false concept that a woman, because of her very nature, somehow or other should not be given as much money as a man for similar work. This antiquated concept has been long and completely demonstrated to be false and it is indefensible from every standpoint. This being so, we may wonder why this legislation is necessary.
 "'The answer is furnished to us in the authoritative information provided by witnesses before the House Committee on Education and Labor and the impressive array of statistics unhappily proving that discrimination in wage payments, on the basis of sex alone, continues to exist even in this modern space age.
 "'Recognizing that the concept of wage payment discrimination against women is false; having before us the surprising but overwhelming evidence that such discrimination still continues to exist; * * * this measure represents the correction of basic injustice being visited upon women in many fields of endeavor * * * extending simple wage justice to the increasing corps of America's working women.'
 109 Cong.Rec. 9212." *Shultz, supra*, 420 F.2d at 656 n. 17.

will * * * be carefully examined to determine whether such programs are, in fact, bona fide." 29 C.F.R. § 800.148.

Male-dominated training programs subject to the close scrutiny required by § 800.148 have failed to pass appellate tests with increasing frequency. See Hodgson v. Security National Bank of Sioux City, 8 Cir. 1972, 460 F.2d 57, reversing a district court decision ruling that a male-dominated bank management training program was bona fide. See also Hodgson v. Fairmont Supply Co., 4 Cir. 1972, 454 F.2d 490, where the Fourth Circuit (reversing the district court) found a violation of the Equal Pay Act, and declined to recognize a sex-oriented sales training program.

The spirit behind the Equal Pay Act was eloquently depicted in Shultz v. Wheaton Glass Co., 3 Cir. 1970, 421 F.2d 259, 265:

"The Act was intended as a broad charter of women's rights in the economic field. It sought to overcome the age-old belief in women's inferiority and to eliminate the depressing effects on living standards of reduced wages for female workers and the economic and social consequences which flow from it."

In light of this enunciation of the clear purpose of the Equal Pay Act, a training program coterminus with a stereotyped province called "man's work" cannot qualify as a factor other than sex. Hodgson v. Fairmont Supply Co., supra, 454 F.2d at 498.

In the instant case, Behrens' president, Clifton, testified that women are not solicited as sales trainees because "females were never considered as suitable for traveling." This is a clear example of the attitude of male suitability designed to be nullified by the Equal Pay Act.

Behrens' sales training procedure is not illusory, nor does it constitute a mere post-event justification for disparate wage payments. Nevertheless, the program has never included a female, and its completion—advancement to a

sales job—is entirely dependent on personnel needs. These two program characteristics compel the conclusion that Behrens' training procedure is not a factor other than sex which should excuse denial of equal pay to female workers and remove them from the aegis of the Equal Pay Act.

"An exemption from the coverage of the Act 'must be narrowly construed.' Phillips, Inc. v. Walling, 324 U.S. 490, 493, 65 S.Ct. 807, 808, 89 L.Ed. 1095 (1945) and Mitchell v. Stinson, 1 Cir., 1954, 217 F.2d 210, 214. The exemptions must be applied only to those 'plainly and unmistakably within its terms and spirit.' Philips, Inc. v. Walling, supra, 324 U.S. at 493, 65 S.Ct. 807. See also Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 392, 80 S.Ct. 453, 456, 4 L.Ed.2d 393 (1960)." Hodgson v. Colonnades, Inc., 5 Cir. 1973, 472 F.2d 42.

Until they reach the position of city desk clerk, Behrens' sales trainees participate in no training activities independent of their regular, productive jobs. This fact reinforces the conclusion that male trainees through most of the training period engage in exactly the same activities as female nontrainees and do not warrant statutory exemption from the Equal Pay Act.

Behrens advances two subsidiary arguments in support of its training program. First, it contends that the term "bona fide training program" contained in 29 C.F.R. § 800.148 means simply "in good faith without fraud." Although the traditional, common law definition of "bona fide" may be as liberal as Behrens' claims, see Ware v. Hylton, 3 U.S. (3 Dall.) 199, 1 L.Ed. 568, the term as used in the regulation at issue here must be construed in light of the statute which that regulation implements. The Equal Pay Act clearly mandates the demise of sex-based wage differences except in special, narrow circumstances A bona fide training program to constitute a valid exception to the Equal Pay Act must represent more than an

honest effort; such a program must have substance and significance independent of the trainee's regular job.

██ ██ Behrens also argues that to rule its "training program" invalid would discriminate against small companies, like itself, who cannot maintain expensive, formal training courses.[8] Certainly, a small corporation with limited resources need not implement as elaborate a training program as those of the corporate giants. But the fact that a corporation is small does not relieve that corporation of its duty to establish a "bona fide training program," if it wishes to escape the mandate of the Equal Pay Act. In addition, all "training programs" which exclude females, whether originated by large companies or small, carry a stigma of suspect validity.[9]

## II. CITY ORDER DESK EMPLOYEES

Employees assigned to work at the city order desk in Behrens' Tyler warehouse take orders by telephone from local customers and fill out the necessary order blanks. The district court found that during the period in question three females and four males worked as city order desk employees in the Tyler division.[10] Those employees were found to have engaged in equal work, but female employees were paid at substantially lower rates. [App. 214.]

Behrens concedes that male and female city desk clerks perform equal work for which the females receive lower pay, but contends that its "sales training program" removes that difference from the interdiction of the Equal Pay Act. For the reasons already stated, we disagree.

## III. DATA PROCESSING DEPARTMENT SUPERVISORS

### A. Equal Work

From January 1, 1964 until June 1, 1966, Behrens employed David K. Blavier, a male, as supervisor of its data processing department in the Tyler division. On termination of Blavier's employment in June 1966, Delores Wooley, a female, took charge of the data processing department. The district court found that David Blavier was paid a salary of $435.00 per month, the equivalent of $2.06 per hour, at the time of his resignation. [App. p. 217.] Delores Wooley, on the other hand, was started in the supervisor job at $1.55 an hour, and her employment has continued at rates substantially less than those paid Mr. Blavier at the time of his resignation.

Behrens argued at trial that the disparate wage payment between Blavier and Wooley was justified by extra work which Blavier performed while employed as supervisor. The district court rejected Behrens' argument and ruled that,

"These male and female employees [Blavier and Wooley] during their respective periods of employment were employed to perform equal work on jobs, the performance of which required equal skill, effort and respon-

---

8. We note in passing that Behrens' annual sales volume has regularly exceeded $1,000,000. Thus, Behrens is only small in relation to the corporate giants.

9. The district court found as a matter of fact that female order fillers were paid substantially less than male "trainees" performing the same work. [App. 211.] Behrens contests the validity of that factual finding, but after careful study of the record, we do not find the district court clearly erroneous.

10. App. pp. 212, 213.
 *Females:*
 Annette Neeley—Jan. 1, 1968 to Dec. 31, 1970

Treva Coomer—Oct. 1, 1968 to Dec. 31, 1970
Patricia Kolb—Nov. 30, 1970 to Dec. 31, 1970
*Males:*
Jack Carney—Jan. 1, 1968 to Mar. 2, 1968
Martin Connor—Jan. 1, 1968 to Mar. 2, 1968
Tommy Ball—Feb. 28, 1970 to July 4, 1970
Thomas Bailey—Dec. 7, 1970 to June 1, 1971

sibility, and they worked under similar working conditions although their employment was not concurrent. 29 U.S.C. § 206(d). Shultz v. First National Bank of Orange, 61 L.C. 32,269; Wirtz v. Koller Craft Plastic Products, Inc., 58 L.C. 32,076 [296 F.Supp. 1195], Department of Labor Regulation, Code of Federal Regulations, Title 29, Part 800, Section 800.114(b) & (c)." [App. 223.]

 Although the Secretary has the burden of proving that the work is equal, Congress in prescribing "equal" work intended to codify a remedial measure which requires not that jobs be identical, but only that they must be substantially equal. Shultz v. Wheaton Glass Co., *supra*, 421 F.2d 259, 265, cert. denied 398 U.S. 905, 90 S.Ct. 1696, 26 L.Ed.2d 64; Hodgson v. Brookhaven General Hospital, 5 Cir. 1970, 436 F.2d 719, 725. And the Equal Pay Act applies to jobs held in immediate succession, as well as simultaneously.[11]

 29 U.S.C. § 206(d)(1) requires equal pay for "equal work on jobs the performance of which requires equal skill, effort and responsibility and which are performed under similar working conditions." In Hodgson v. Brookhaven General Hospital, *supra*, this Court sur-

veyed the expanding number of cases wrestling with the critical criterion of "equal effort," and described the emerging doctrine as holding that,

"jobs do not entail equal effort, even though they entail most of the same routine duties, if the more highly paid job involves additional tasks which (1) require extra effort, (2) consume a significant amount of the time of all those whose pay differentials are to be justified in terms of them, and (3) are of an economic value commensurate with the pay differential."

436 F.2d at 725. Thus, employers may not be permitted to frustrate the purposes of the Act by calling for extra duty from male employees only occasionally, or by requiring male employees to perform tasks normally done by full-time personnel at a lower rate of pay.

 The district court found that the primary responsibilities of the data processing room supervisor included: managing the activities of department employees, adjusting malfunctioning data processing machines, and assuming responsibility for departmental errors and priorities. [App. 217.] Both Blavier and Mrs. Wooley performed these functions.[12]

11. 29 C.F.R. § 800.114(b):
"(b) Section 6(d)(1) prohibits discrimination on the basis of sex in the payment of wages to employees 'for equal work *on jobs*' which are equal under the standards which it provides (emphasis supplied). (See the discussion in § 800.119, et seq.) The legislative history of the Equal Pay Act expressly refers to the War Labor Board experience as furnishing a guide for testing 'the relationship between jobs' and determining 'equal work' and 'equal skills' for purposes of a 'practical' administration and application of the Act's 'equal pay policy' (see, e. g., S. Rept. 176, 88th Cong. 1st sess., to accompany S. 1409; H.Rept. 309, 88th Cong. 1st sess., to accompany H.R. 6060). Some of the earliest cases confronting the War Labor Board on the application of the 'equal pay for equal work' principle involved situations in which women were being hired to re-

place men as a result of the manpower shortages. The Board consistently ruled that the principle applied to these situations, as well as to situations where male and female employees performed the same work concurrently and interchangeably, and therefore that women assigned 'to take the place of men' to perform substantially the same jobs 'formerly performed by men' were entitled to the same rate of pay as the men whom they replaced. Rotary Cut Box Shook Industry, 12 W.L.B. Rept. 605, 606, 608; General Electric Co., and Westinghouse Electric Co., supra [Case Nos. 111–17208–D and 111–17209–D, Dec. 12, 1945], at pp. 668–669, 677, 686."

12. At one point Behrens advanced, but did not fully develop, the theory that Blavier was a "supervisor" while Mrs. Wooley was merely a "chief operator." See App., p. 731 and appellant's brief, p. 38. But

Blavier testified in the district court that while serving as data processing room supervisor he performed several extra duties in addition to management of the data processing department. He worked several hours on Saturday mornings taking orders and delivering merchandise to customers. [App. 648, 669–671.] He occasionally took telephone orders at the city order desk [App. 648], and he drove a delivery truck, infrequently, when specially requested [App. 664]. In addition, he participated in Sunday sales shows two or three times a year [App. 670].

■ Behrens contends that Blavier's extra duties, not performed by Mrs. Wooley, entail sufficient extra effort on the part of Blavier to justify his higher wage rate. We disagree. Blavier admitted that his primary and principal responsibility was working in the data processing room. [App. 664]. The extra duties performed by Blavier do not satisfy the three-pronged test for inequality of effort delineated in Hodgson v. Brookhaven General Hospital, *supra*. Some of the activities Blavier engaged in did not consume a significant amount of time, and those which did, specifically the Saturday morning duties, were ordinarily performed by full-time employees compensated at a lower rate. See Shultz v. Wheaton Glass Co., *supra*, 421 F.2d at 263. The district court's interpretation of the facts, leading to its conclusion of equality of effort, strongly reinforces this holding.

The extra duties performed by Blavier, not only fail to meet the Hodgson v. Brookhaven General Hospital standard, but also take on reduced significance viewed in light of the fact that the majority of those extra duties were performed on the weekend, while the crucial issue is one involving a discriminatory *hourly* wage rate.

the controlling factor under the Equal Pay Act is not job description, but job content. Hodgson v. Brookhaven General

**B. *Limitations***

The statute of limitations applicable to actions brought under the Equal Pay Act provides that " * * * every such action shall be forever barred unless commenced within two years after the cause of action accrued." 29 U.S.C. § 255(a). Appellant argues that, since Mrs. Wooley began her duties as supervisor on May 6, 1966, and suit was not brought until December 17, 1970, the cause of action accrued in 1966 and the statute bars this suit. We disagree.

■ Sex-based, discriminatory wage payments constitute a continuing violation of the Equal Pay Act. See Shandelman v. Schuman, E.D.Pa.1950, 92 F. Supp. 334, 335, and Mitchell v. Lancaster Milk Co., M.D.Pa.1960, 185 F.Supp. 66, 70, holding that illegal minimum wage and overtime payments constitute continuing violations. The court in *Mitchell*, quoting *Shandelman*, stated that,

"It is well settled that 'A separate cause of action for overtime compensation accrues at each regular payday immediately following the work period during which the services were rendered and for which the overtime compensation is claimed.'"

To hold otherwise would permit perpetual wage discrimination by an employer whose violation of the Equal Pay Act had already lasted without attack for over two years.

Appellant's reliance on Unexcelled Chemical Corp. v. United States, 1953, 345 U.S. 59, 73 S.Ct. 580, 97 L.Ed. 821, and United States v. Lovknit Mfg. Co., 5 Cir. 1951, 189 F.2d 454, cert. denied 342 U.S. 896, 72 S.Ct. 229, 96 L.Ed. 671 (1952), is misguided. Those cases held only that a cause of action accrues, giving rise to liability for liquidated damages under the Walsh-Healey Public Contracts Act when the minor in ques-

Hospital, *supra*, 436 F.2d at 724; 29 C.F.R. § 800.121 (1970).

tion is employed. That narrow holding is not relevant here.

██ Behrens' wage discrimination is a continuing violation of the Equal Pay Act, and wages due under the Act for the two years preceding this suit are recoverable.

## IV. CHECKERS

In ruling on the third category of workers, designated "checkers" or "double checkers," the district court found that two female workers were employed in that capacity during the period in question—Edna Newland from January 1, 1968 to June 1, 1970, and Ruth Taylor from November 1, 1970 to December 31, 1970. The court also found that during the same period Behrens employed two males as "checkers"—Julius Horton from January 1, 1968 to June 22, 1968, and Mark Meadows from March 1, 1970 to October 3, 1970. Male and female "checkers" performed the same principal duty—they checked the merchandise to be shipped against the customer's order to prevent shipment of unordered items.

The female "checkers" were paid at rates below those paid to the male "checkers." [13] yet, they were found to have performed work "requiring substantially equal skill, effort and responsibility." [App. 215.]

Behrens raises several objections to the district court's holding with respect to "checkers." First, it challenges the ruling that Mrs. Newland, while checking in the middle aisle, performed work equal to that of Horton who checked at the end of the aisle. Behrens claims that the end of the aisle checker was responsible for checking narcotics, an obligation not imposed upon the middle of the aisle checker and purportedly requiring sufficient extra responsibility and effort to render the positions unequal under the Act.

██ Although checking narcotics certainly entails increased responsbility,

the mechanical aspects of the task merely require preparation of a few extra forms. [App. 301.] The developing law of remunerative equality has increasingly been viewed as a question of fact to be determined on a case by case basis. See Hodgson v. Golden Isles Convalescent Homes, *supra,* and Hodgson v. Brookhaven General Hospital, *supra.* Evidence clearly exists to support the district court's finding that Mrs. Newland and Horton performed equal work. In fact, the pay schedule reveals that Mrs. Newland's salary was not immediately increased when she became close-out checker, suggesting that the narcotics handling aspect of that job was not by itself determinative of higher pay.

Second, appellant argues that no male worked as a close-out checker between February 2, 1970 and June 19, 1970 when Mrs. Newland performed that task. Horton, Mrs. Newland's predecessor at the close-out point, received $1.65 an hour, the same wage Mrs. Newland received after February 2, 1970. Thus, no equal pay violation occurred as between Horton and Mrs. Newland for that period.

██ The district court found, however, that another male employee, Mark Meadows, performed work equal to that of a checker at a higher pay than Mrs. Newland during the February to June period. Meadows was officially designated a shelver, but job content, not job description is the critical issue. Hodgson v. Brookhaven General Hospital, *supra.* This contention of unequal work, like Behrens' first argument, is basically a disagreement over the court's factual determination. Ample facts support the district court's finding and that finding is not clearly erroneous. Rule 52, F.R. Civ.P.

Ruth Taylor was found to be due $558.94 in back wages for the period from December 21, 1968 to November 16, 1971. She worked as order filler prior to November 1, 1970, and from that date to November 16, 1971 she worked as

---

13. Plaintiff's Exhibit No. 6—Schedule P–10, App. pp. 170–171, documents this wage discrepancy.

close-out checker. The parties agree that her compensation as close-out checker was not in violation of the Act's equal pay provisions. Accordingly, the amount of restitution awarded her by the district court should be reduced by the amount which was computed to have accrued from November 1, 1970 to November 16, 1971. (Behrens' Brief, p. 45; the Secretary's Brief, p. 31 n. 14.) The district court's judgment should be modified by so reducing the judgment in favor of Ruth Taylor. In all other aspects the judgment is affirmed.

Modified and affirmed.