Janie MITCHELL, Plaintiff–Appellant,

v.

JEFFERSON COUNTY BOARD OF
EDUCATION, Defendant–Appellee.

No. 90–7538.

United States Court of Appeals,
Eleventh Circuit.

July 23, 1991.
As Amended Sept. 10, 1991.

James Mendelsohn, Richard J. Ebbinghouse, Robert L. Wiggins, Jr., Gordon, Silberman, Wiggins & Childs, P.C., Birmingham, Ala., for plaintiff-appellant.

Carl E. Johnson, Jr., Jack Merrell Nolen, Jr., Bishop, Colvin & Johnson, Birmingham, Ala., for defendant-appellee.

Before HATCHETT and ANDERSON, Circuit Judges, and LIVELY *, Senior Circuit Judge.

LIVELY, Senior Circuit Judge:

This is an action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. and the Equal Pay Act of 1963, 29 U.S.C. § 206(d). The plaintiff, a female employee of the defendant, appeals from a judgment for the defendant on all claims, entered following a bench trial.

I.

Janie Mitchell has been employed since 1970 by the defendant Jefferson County Board of Education, which operates a school district in Alabama. She was initially hired to perform secretarial duties at the school district's Rosedale facility. Within three months of her initial employment, Ms. Mitchell's primary duties had shifted to collating printed materials manually. In 1975, Ms. Mitchell was transferred to work in the Textbooks and Printing Department at the Board's newly established textbook and resource center at Ketona. Shortly after being transferred to the Ketona facility, Ms. Mitchell began training as an offset printer. Since that time she has operated an A.B.Dick offset press. In addition to her primary duties as a printer, Ms. Mitchell occasionally operates the camera used in offset printing, stamps textbooks when they are received by the school district and before they are distributed to the students, and answers the telephone at times. Ms.

* Honorable Pierce Lively, Senior U.S. Circuit Judge, for the Sixth Circuit, sitting by designation.

Mitchell performed essentially these same duties from 1975 through the commencement of trial. According to the Board, Ms. Mitchell's official job title is that of Printing Equipment Operator I. The job description for this position states that Ms. Mitchell's primary responsibilities include the assembly of materials for reproduction, the coordination of production with other employees, the assistance in training of other workers, and the operation of the presses, collators and cameras.

Ms. Mitchell based her claims of discrimination on a comparison of her wages with those of a male co-worker, Ervin Wilkerson, who was hired by the Board in 1969 to perform printing duties. Like Ms. Mitchell, he also began work at the Rosedale facility but was transferred in 1974 to the new facility in Ketona. Mr. Wilkerson initially operated an A.B.Dick offset press but shortly after moving to Ketona he was assigned to operate a newly purchased Davidson press. According to the defendant, Mr. Wilkerson's official job title is Printing Equipment Operator II. The job description for this position states that Mr. Wilkerson's primary responsibilities include laying out copy for the camera, making display copy, operating the camera and the headliner machine, coordinating job projects with the offset operator, and assisting in the training of other workers.

In 1975, the Board instituted its first formal salary schedule (1975 schedule) pertaining to classified personnel, or those employees who did not hold a certificate for teaching, such as secretaries, teachers aides, custodians and printers. The 1975 schedule established seven named pay grades, and each grade contained either six or eleven steps. There is scant evidence about the process by which each classified employee was placed on the 1975 salary schedule. The director of classified personnel, who had been employed in that position since 1984, testified that it was her understanding that the 1975 salary schedule was implemented as a result of bargaining between the Board and some employee representatives, and that no employee's pay was reduced as a result of the implementation of the new schedule. According to Ms. Mitchell's personnel record, in the academic year 1975–76, which was the first year that the 1975 schedule was implemented, Ms. Mitchell was ranked as a Common Laborer, step 3, and was earning $422.00 per month. According to Mr. Wilkerson's personnel record, in the academic year 1975–76, he was ranked two grades higher than Ms. Mitchell and placed on the Apprentice grade, step 2, with a monthly salary of $620.00.

Under the Board's salary policy applicable to the 1975 schedule, each employee would progress one step per year within the grade in which he or she had been placed. When an employee reached step six in one of the two grades that had only six steps, that person would be placed on step one of the next highest grade. But once an employee reached step eleven of any of the five grades that had eleven steps, that employee was considered to have "topped out," or to be ineligible for an automatic annual elevation to the next grade.

Also under the Board's salary policy, an employee could receive a merit raise outside the annual step increases. Ms. Mitchell received a merit raise in 1978 and Mr. Wilkerson received one in 1980. On November 1, 1980, Mr. Wilkerson moved from Apprentice, step 6 to Journeyman, step 1. His monthly salary increased to $1063.72. At the time of Mr. Wilkerson's merit raise, Ms. Mitchell was on the Semi–Skilled scale, step 8, earning $912.92 monthly.

In August 1985, the Board adopted and implemented a new salary schedule (1985 schedule). The new schedule was adopted in part as a result of the Board's negotiations with its employees' representatives, who had been expressing dissatisfaction over the fact that the lower paid employees had to progress seventeen steps before the possibility of advancement to the next grade. The new salary schedule reduced the number of grades from seven to five by combining Common Laborer and Semi–Skilled into Pay Grade I and combining Apprentice and Journeyman into Pay Grade II. In addition, all five of the new pay grades now had eleven steps each, so

that the former seventeen steps of Pay Grade I and Pay Grade II had to be compressed. In order to make the transition from the 1975 schedule to the 1985 schedule, classified personnel were given their annual step increases if they had not "topped out," and then placed on the new salary schedule at the grade and step that was closest to but not lower than their salary under the 1975 schedule. In addition, following placement on the 1985 schedule, all service employees received a state-mandated raise.

The conversion from the old schedule to the new one had differing effects on the employees' salaries. Immediately prior to the implementation of the 1985 salary schedule, Ms. Mitchell was on the Apprentice scale, step 1, earning $7.23 per hour. Because of her eligibility for the annual step increase, she was automatically advanced one grade to Apprentice, step 2, with an hourly wage of $7.29. This latter figure was translated onto the new salary schedule, which placed Ms. Mitchell in Pay Grade II, Step 2, at $7.38 per hour. She was then given the state-mandated raise to $8.02 per hour. After the automatic annual step increase and prior to the state-mandated raise, that is, considering solely the effect of the new salary schedule, Ms. Mitchell received a nine cent per hour increase, or a 1.2% increase from her former salary.

Immediately prior to the implementation of the new schedule, Mr. Wilkerson was on the Journeyman scale, step 5, earning $8.39 per hour. Because of his eligibility for an annual increase, he was advanced to Journeyman, step 6, with a corresponding hourly wage of $8.45. The latter figure was translated onto the new salary schedule, which placed Mr. Wilkerson in Pay Grade II, step 10, earning $8.58 per hour. The state-mandated increase elevated his pay to $9.22 per hour. Considering solely the effect of the conversion to the new salary schedule, Mr. Wilkerson received a thirteen cent per hour increase, or 1.5% increase from his former salary. Thus, under the new schedule Ms. Mitchell and Mr. Wilkerson received comparable raises when considered as a percentage of their old salaries.

In September 1987, Ms. Mitchell first learned that she was being paid less than Mr. Wilkerson because of a casual remark he had made about "topping out," or reaching step eleven in Pay Grade II. By this time, she was also in Pay Grade II, but only at step 4.

## II.

After complaining of unequal treatment and receiving an unsatisfactory response from the Board, Ms. Mitchell filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) on October 24, 1987. The charge stated in pertinent part:

> I was denied equal pay for my position as a printer by my employer ... I was not provided a reasonable explanation for the different [sic] in the pay increase granted a male in the printing department, and the small increase I was granted in September 1987.

The EEOC issued a right to sue letter, and Ms. Mitchell filed a timely suit in the district court.

## A.

The district court complaint is quite short, and alleges violations of both Title VII and the Equal Pay Act (EPA). The complaint states only generally that the defendant "discriminated on the basis of sex against the plaintiff with respect to the training, job assignments, promotion, wages, and terms, conditions, and privileges of employment." This is taken almost verbatim from section 703(a)(1) of Title VII. More specifically, the complaint alleges that in September 1986, "a male was advanced from printer step 4 to printer step 11." If this statement is intended to allege a problem with the implementation of the 1985 salary schedule, both the date and the references to Mr. Wilkerson's resulting salary increase are inaccurate. Finally, the complaint states that the plaintiff "has more formal education than the male awarded the higher pay raise" and that she

"was subjected to unequal treatment because of her sex."

In response, the Board filed a motion to dismiss for failure to state a claim upon which relief could be granted, which the district court denied. The Board then filed an answer denying Ms. Mitchell's allegations of discrimination. The answer did not include any affirmative defenses, but the Board subsequently amended its answer twice to plead affirmative defenses. First, it asserted that the complaint was not timely filed "inasmuch as the last allegedly discriminatory act upon which the complaint is based took place on or before August 31, 1985, well before 180 days preceding the filing of the charge of employment discrimination with the [EEOC]." In its second amendment, the Board asserted that "the action is barred by the applicable statute of limitations." The Board never pled a defense to either the Title VII claim or the EPA claim based upon the existence of a bona fide seniority system.

### B.

The district court conducted a one-day bench trial. At the conclusion of the plaintiff's case, the Board made a motion to dismiss under Fed.R.Civ.P. 41(b), arguing that the plaintiff failed to make out a prima facie case of discrimination under either the EPA or Title VII. Following a colloquy between the attorneys and the judge regarding whether the acknowledged wage disparity was based on a seniority system, the judge denied the Board's motion. At the end of the trial the district court took the case under submission and soon thereafter filed a memorandum of opinion denying both of the plaintiff's claims and directing entry of judgment for the Board.

### III.

The district court construed the plaintiff's claim as charging a Title VII violation solely based upon implementation of the revised pay schedule in August 1985, stating:

> [t]he essence of Mitchell's claim is that as a result of their ordinary annual step increases in September 1985 and the con-

version to the new "Pay Grade" salary schedule Wilkerson was increased five steps and she was increased only one in violation of the defendant's duty not to discriminate against her on the basis of her sex. She further claims that the resulting disparity has caused him to be paid more for the same or similar work since that time in violation of the Equal Pay Act.

The court noted that in addition to denying all claims of discrimination generally, the Board contended that the action was time-barred because the EEOC complaint was not filed within 180 days from the alleged discriminatory act (the adoption and implementation of the revised pay scale in August–September 1985). Title VII requires that a charge be filed within this time. The court did not identify any separate defense to the EPA claim, other than the general denial of discrimination.

The district court granted judgment for the defendant on the Title VII claim principally upon the determination that the disparity between the wages of the plaintiff and Mr. Wilkerson resulted from the operation of a bona fide seniority system. Section 706(h) of Title VII permits an employer to carry out otherwise unlawful employment practices pursuant to a bona fide seniority system provided differences in conditions of employment "are not the result of an intention to discriminate because of race, color, religion, sex, or national origin." The court rejected the plaintiff's arguments that the salary schedule was not a seniority system, and that the Board waived reliance on the alleged seniority system by not pleading it as an affirmative defense under Fed.R.Civ.P. Rule 8(c). The district court found that earlier Eleventh Circuit rulings to the effect that an employer must plead a seniority system as an affirmative defense to a Title VII claim had been undercut by the Supreme Court in *Lorance v. AT & T Technologies, Inc.,* 490 U.S. 900, 109 S.Ct. 2261, 104 L.Ed.2d 961 (1989). In addition the district court ruled unequivocally that the 1985 pay schedule is a seniority system. Finally, the court found that the Board had no discriminatory

purpose in creating this "seniority system," and that therefore it was "bona fide."

The district court applied essentially the same reasoning to the Equal Pay Act claim as to the one under Title VII. The court concluded that its determination that the wage differential between the plaintiff and Mr. Wilkerson resulted from the application of a bona fide seniority system brought it within "a specific exception to the general requirement for equal pay among the sexes."

The court then stated its conclusions without differentiating between the separate claims:

> The plaintiff did not file her EEOC charge in a timely fashion and, in any event, failed to prove that she was a victim of intentional discrimination. Further, the disparity between her wages and those of Mr. Wilkerson are justified under the law because they result from application of a bona fide seniority system.

## IV.

### A.

The parties have briefed the question of whether a bona fide seniority system is an affirmative defense to a Title VII claim, which is waived if not specifically pled. *Lorance* appears to hold that reliance on a seniority system is not a true affirmative defense to a Title VII claim. On the other hand, in its discussions of defenses to Equal Pay Act claims contained in section 206(d)(1) and which have been incorporated into Title VII, the Supreme Court has referred to the reliance on a seniority system as one of four affirmative defenses. *County of Washington v. Gunther*, 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981); *Corning Glass Works v. Brennan*, 417 U.S. 188, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974). Justice Scalia, writing for the majority in *Lorance*, did not refer to the Court's Equal Pay Act cases in concluding that reliance on a seniority system in a Title VII case is not an affirmative defense.

■ Because we have determined that the district court erred in concluding that the 1985 revised pay schedule constituted a bona fide seniority system, we need not decide whether the Board waived this defense by not pleading it specially. We note, however, that this court has stated that it is not an abuse of discretion for a district court to receive and consider evidence in support of an affirmative defense that a defendant has failed to plead. *Hassan v. U.S. Postal Service*, 842 F.2d 260, 263 (11th Cir.1988). Liberal pleading rules require a court to determine whether a plaintiff has notice that a defendant is relying on an unpled affirmative defense and whether the plaintiff can legitimately claim surprise and prejudice from a failure to plead the defense affirmatively. *Id.*

### B.

■ The determination that an employer has in place a seniority system is a ruling on a question of law, subject to plenary review. *Underwood v. Hunter*, 730 F.2d 614, 617 n. 6 (11th Cir.1984), *aff'd*, 471 U.S. 222, 105 S.Ct. 1916, 85 L.Ed.2d 222 (1985); *Cathbake Investment Co.*, 700 F.2d 654, 656 (11th Cir.1983).

The Supreme Court considered the meaning of "seniority system," as used in Title VII, in *California Brewers Assn. v. Bryant*, 444 U.S. 598, 100 S.Ct. 814, 63 L.Ed.2d 55 (1980). Noting that Title VII does not define the term, the Court determined that it was appropriate to start with "commonly accepted notions about 'seniority' in industrial relations, and to consider those concepts in the context of Title VII and this country's labor policy." *Id.* at 605, 100 S.Ct. at 819. Taking this approach, the Court first noted that in the labor relations context, "seniority" denotes length of employment. *Id.* The Court continued:

> A "seniority system" is a scheme that, alone or in tandem with non-"seniority" criteria, allots to employees ever improving employment rights and benefits as their relative lengths of pertinent employment increase. Unlike other methods of allocating employment benefits and opportunities, such as subjective evaluations or educational requirements, the principal feature of any and every

"seniority system" is that preferential treatment is dispensed on the basis of some measure of time served in employment.

*Id.* at 605–06, 100 S.Ct. at 819 (footnotes omitted).

■ The district court stated that the revised pay schedule constituted a seniority system because "the Board has since the mid–1970's granted annual step pay increases on the basis of each employee's length of service with the Board and on no other." While this statement is true, it fails to recognize that the pay schedule does nothing more than increase each employee's pay annually without any reference to the employee's actual length of service with the Board, or the employee's date of hire in relation to that of other employees. The evidence is uncontradicted, from witnesses who were supervisory employees of the Board, that neither the 1975 nor the 1985 schedule reflects the actual beginning date of employment of any employee. Rather, each employee's place on the 1975 pay schedule was based solely on the job description that the Board had applied to that employee's duties at some earlier time and the employee's assignment at that time was not based on seniority. Thus, the original salary schedule did not reflect seniority or longevity. It reflected only the employee's current assignment when the schedule was adopted. On this basis alone, each employee was "slotted" within the schedule. Thus placed on the ladder without reference to his or her length of employment, each employee moved in lock step with all other employees, one year at a time, through the classifications established by the Board.

The "conversion" to the 1985 schedule reflected past salary differentials among employees, again without reference to length of employment. It was an attempt to "squeeze" all the classified employees into a system containing five pay grades, each with eleven steps, from a system with seven classifications, varying from six to eleven steps within each grade. The effect of this process was to perpetuate past wage discrepancies that were unrelated to seniority because of the manner in which each employee's original position on the schedule was determined. A Board witness testified that there was no attempt to match the job descriptions of the employees in 1985 with the actual work being performed. It was a purely mechanical process designed to reslot every one without causing any one to suffer a reduction in pay. Again, no attempt was made to base an employee's position on the schedule by reference to his or her original date of hire.

The Supreme Court stated that length of employment is the key element in a seniority system. A seniority system, either "alone or in tandem with non-'seniority' criteria, allots to employees ever improving employment rights and benefits *as their relative lengths of pertinent employment increase.*" *California Brewers,* 444 U.S. at 606, 100 S.Ct. at 819 (emphasis added). Under the Board's salary schedules the increase in employees' *relative lengths of employment* produces no "ever improving employment rights and benefits." In fact, *relative lengths of pertinent employment* do not affect the only right or benefit involved—rate of pay. Every employee began with an assignment to a position in the 1975 schedule, without reference to length of employment, and then proceeded through the annual steps along with all other employees in total disregard of relative lengths of employment. Longevity of employment is a factor only to the extent that it moves all employees upward together on an annual basis; it was not a factor in fixing the original or revised slot for each employee, which continues to determine the position of each employee on the schedule.

Although it is not clear from the record, it appears from the testimony of the director of classified personnel, that the Board has either formal or informal rules concerning vacations and extended health leave that affect employee rights and benefits. These, and such matters as order of layoff and recall, and the right to bid on job openings typically are components of a seniority system. Yet, none of these important rights and benefits are contained in the Board's salary schedules, and some ap-

pear to exist totally apart from that schedule. In addition, Board witnesses made it clear that all promotions require individual recommendations and have no connection with seniority. Black's Law Dictionary (Fifth Ed.) defines "seniority" as follows:

> **Seniority.** Precedence or preference in position over others similarly situated. As used with reference to job seniority, worker with most years of service is first promoted within range of jobs subject to seniority, and is the last laid off, proceeding so on down the line to the youngest in point of service.

This definition stresses total length of service, which must take into account an employee's initial date of hire, and the preferment that a more senior employee receives relative to the more junior ones. These are the same elements that appear in the Supreme Court's less expansive definition in *California Brewers.*

The Board's salary schedules merely reward all employees for continuing to work; they completely fail to reflect total length of employment and provide no "ever improving employment rights and benefits as their relative lengths of pertinent employment increase."

We conclude, as a matter of law, that the Board's pay schedule did not constitute a seniority system.

### V.

Because the district court based denial of both claims, at least in part, on its conclusion that the admitted disparity between the plaintiff's wages and those of Mr. Wilkerson resulted from the requirements of a seniority system, it is necessary to remand the case.

### A.

■ A Title VII plaintiff can make a case by proving either disparate treatment or disparate impact. To recover for disparate treatment, the employee must prove that the employer intentionally discriminated against her. On the other hand, a plaintiff can recover under the disparate impact theory by proving that some employment practice that is facially neutral in its treatment of similarly situated employees has a disproportionately adverse effect on those employees who are a member of some protected class. Proof of an intent to discriminate is not required.

■ Ms. Mitchell's complaint appears to charge the Board with both disparate treatment and disparate impact. In her testimony, however, the plaintiff stated at the trial that she was only comparing her salary with that of Mr. Wilkerson. We believe the plaintiff limited the claim to one of disparate treatment, and thus was required to prove discriminatory intent. The district court found that the Board had no discriminatory purpose in establishing the 1985 pay schedule. We believe this finding is supported by substantial evidence and is not clearly erroneous. Men and women are treated the same—all receive annual step increases—and the plaintiff produced no proof that intentional gender discrimination was a factor in the assignment of "slots" to her and Mr. Wilkerson either in 1975 or in 1985. Although the district court did not follow the procedure prescribed in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and apply shifting burdens of proof, it did make a finding that Ms. Mitchell had failed to carry her burden of persuasion on the ultimate factual issue in a disparate treatment case—whether the defendant intentionally discriminated against the plaintiff. This abbreviated procedure was approved by the Supreme Court in *U.S. Postal Service Board v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 1481, 75 L.Ed.2d 403 (1983).

Thus, although we disagree with the district court's ruling that the Board's pay schedule constituted a seniority system, we agree with its ultimate finding under Title VII that the plaintiff failed to prove intentional gender discrimination.

### B.

The Equal Pay Act provides that no employer shall discriminate between employees on the basis of sex by paying employees of one sex at a lower rate than that at which he pays employes of the opposite sex

"for equal work on jobs the performance of which requires equal skill, effort and responsibility, and which are performed under similar working conditions...." 29 U.S.C. § 206(d)(1). This prohibition is subject to four exceptions: "where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." *Id.*

■ The Supreme Court has stated that the EPA consists of two parts, a definition of the violation followed by four affirmative defenses. *County of Washington v. Gunther*, 452 U.S. 161, 169, 101 S.Ct. 2242, 2247, 68 L.Ed.2d 751 (1981). A plaintiff establishes a prima facie case by showing that her employer has paid different wages to male and female employees for equal work, as described in the first part of the Act. *E.E.O.C. v. White & Son Enterprises*, 881 F.2d 1006, 1009 (11th Cir. 1989). The burden then shifts to the employer to show justification for the differential by establishing one of the exceptions, or affirmative defenses, contained in the second part of the Act. *Corning Glass Works v. Brennan*, 417 U.S. 188, 196–97, 94 S.Ct. 2223, 2229, 41 L.Ed.2d 1 (1974); *Price v. Lockheed Space Operations Co.*, 856 F.2d 1503, 1505 (11th Cir.1988). To establish a prima facie case an employee "need only show discrimination in pay against an employee vis-a-vis one employee of the opposite sex." *White & Son Enterprises*, supra, 881 F.2d at 1009. The plaintiff is not required to prove intentional discrimination, just that the employer pays unequal wages for equal work, as defined in the Act.

■ The district court dismissed the Equal Pay Act claim on the basis of its erroneous conclusion that the difference in wages paid the plaintiff and Mr. Wilkerson resulted from the operation of seniority system.

The Board's own records show that there is a disparity between Ms. Mitchell's wages and those of her co-worker, Mr. Wilkerson. We have determined that a seniority system defense, the only one relied upon by the Board, is not viable. Thus, the only remaining question on the issue of liability is whether the plaintiff and Mr. Wilkerson perform equal work as defined by the Act.

Upon remand the district court will make findings of fact to determine whether Ms. Mitchell and Mr. Wilkerson do "equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." The evidence on this issue is in conflict. Ms. Mitchell testified that she and Mr. Wilkerson perform the same work, requiring equal skill, effort and responsibility, under similar working conditions. Although the plaintiff and Mr. Wilkerson are regularly assigned to different presses, she has worked on both types, as has he. Mr. Wilkerson testified that since Ms. Mitchell became a printer after her transfer to Ketona, the two of them have had "basically" the same job, and did at the time of the trial. (Tr. 27).

The Board attempted to show that the jobs are not equal. The director of classified personnel relied on the job descriptions to support her view that the jobs are different. On cross-examination, however, she testified that she did not believe the job descriptions of either the plaintiff or Mr. Wilkerson were accurate at the time of trial. (Tr. 87). Finally, she acknowledged that as early as 1978 Ms. Mitchell's immediate supervisor had recommended a raise for her because she was "six steps below the lowest printer and doing essentially the same kind and quality of work." (Tr. 90).

The director of textbooks and printing testified that Mr. Wilkerson performed some duties that Ms. Mitchell had not been asked to perform. The witness stated that the daily routine of both the plaintiff and Mr. Wilkerson revolved around their presses. To the extent that Mr. Wilkerson's work is "significantly different" from Ms. Mitchell's, it depends solely on what the witness asks Mr. Wilkerson to do. (Tr. 138). Both perform various other tasks, as required, which are not "fundamental" to the basic task of printing. *Id.*

The district court made no finding on this issue but must determine on remand whether Ms. Mitchell established a prima facie case under the EPA by demonstrating that she and Mr. Wilkerson perform "equal work" as defined by the EPA.

 The Board also pled and preserved a general statute of limitations defense, although it did not articulate whether one or both of the plaintiff's two actions was time-barred. The district court did not address the Board's argument that the EPA claim was time-barred. In the event that its other defenses fail, the Board contends on appeal that Ms. Mitchell's EPA claim was time-barred under the EPA's two year statute of limitations, found at 29 U.S.C. § 255. The Board argues that the claim accrued in August 1985 when the salary schedule was first implemented and it consequently expired in August of 1987. Since Ms. Mitchell did not file her claim with the EEOC until October 24, 1987, the Board argues that her claim was untimely.

The theory of continuing violations has been applied consistently to actions under the Equal Pay Act. The Eleventh Circuit has long held that "[s]ex based, discriminatory wage payments constitute a continuing violation of the Equal Pay Act." *Hodgson v. Behrens Drug Co.*, 475 F.2d 1041, 1050 (5th Cir.1973). As a rationale for this holding, the court adopted the continuing violation theory that had been applicable to challenges under the Fair Labor Standards Act for illegal minimum wages or overtime payments. "To hold otherwise would permit perpetual wage discrimination by an employer whose violation of the Equal Pay Act had already lasted without attack for over two years." *Id.* See also, *Corning Glassware v. Brennan*, 417 U.S. 188, 208–10, 94 S.Ct. 2223, 2234–35, 41 L.Ed.2d 1 (1974); *Jenkins v. The Home Insurance Co.*, 635 F.2d 310, 312 (4th Cir.1980). Under the application of this rule, Ms. Mitchell's claim is not time-barred.

The judgment of the district court is AFFIRMED in part and REVERSED in part, and the case is REMANDED to the district court for further proceedings consistent with this opinion.