**Karen A. LENIHAN, Plaintiff,**

v.

**THE BOEING COMPANY, Defendant.**

No. CIV.A. H–96–1589.

United States District Court, S.D. Texas, Houston Division.

Jan. 14, 1998.

778

Eugene B. Wilshire, Jr, Wilshire, Scott and Dyer, Houston, TX, for Karen A Lenihan.

W. Carl Jordan, Vinson & Elkins, Houston, TX, for Boeing Company.

## MEMORANDUM AND ORDER

CRONE, United States Magistrate Judge.

Pending before the court is Defendant The Boeing Company's ("Boeing") Motion for Summary Judgment (# 35). Having reviewed the pending motion, the submissions of the parties, the pleadings, and the applicable law, this court is of the opinion that Boeing's motion for summary judgment should be granted in part and denied in part.

### I. *Background*

Plaintiff Karen A. Lenihan ("Lenihan") began working for Boeing in September 1978 in Wichita, Kansas. She was terminated from the company in November 1984 for excessive absenteeism. Subsequently, she worked for Boeing Mississippi, Inc., a now defunct subsidiary of Boeing, until 1989, when it closed. She was then rehired by Boeing to work in Huntsville, Alabama, on Boeing's Space Station Freedom project for NASA. Her job involved specific tasks relating to the administration of government-owned property on the space station contract. In October 1993, Lenihan's group, the equipment management group, was transferred to Boeing's Houston, Texas, division. Lenihan alleges that she did not want to move to Houston but that Boeing requested her to relocate, assuring her that her stay in Houston would not exceed six months. When she transferred, she was the group's "lead." According to Lenihan, "[t]he lead position designates the employee with the experience, training and ability to perform all equipment management tasks and who is responsible for assigning work to her group members at their skill level and ensuring that their work is performed correctly and in a timely manner."

Until 1991, Lenihan's work experience at Boeing was in "nonexempt" positions in which she received several raises, promotions, and changes in job title involving increased responsibility. In 1990, she was made a "nonexempt lead," which entailed leading team members, attending staff meetings, and performing hands-on work with her team. After complaining to her manager, Kenneth W. Hardy ("Hardy"), Lenihan was promoted to the position of program planner, an exempt level position, on May 31, 1991. On June 11, 1994, as part of Boeing's redesign of its position descriptions, job titles, and pay grading, Lenihan's job title was changed from program planner to her cur-

rent title, integrated program planning specialist 3 (grade 52). As a result, Lenihan received a salary increase, although her duties did not change. Since that time, Lenihan has received three other merit salary increases, resulting in her current annual salary of $44,150.

Lenihan contends that Boeing is discriminating against her because of her gender in that her salary is not commensurate with the salary of male counterparts who possess comparable skills and perform similar functions. In fact, Lenihan alleges that her "job skills, efforts, and level of responsibility are greater than that of many of her male counterparts, and yet, she is paid substantially less than them [sic]." Specifically, Lenihan alleges that Boeing employees Alfred Hicks ("Hicks"), Eugene Berry ("Berry"), Tom Rozycki ("Rozycki"), Tony Craig ("Craig"), Jerry McCormick ("McCormick"), and Ron Glover ("Glover") are paid substantially higher salaries than Lenihan despite the fact that she has substantially equal skills, duties, and responsibilities. For example, she asserts that Hicks's annual salary exceeds hers by more than $20,000. Lenihan, however, contends that her experience exceeds Hicks's by nine years, she has nineteen more tasks assigned to her, her job demands greater technical skills and responsibility than does Hicks's, and she possesses relevant accreditation, certification, and training that is superior to Hicks's. Boeing concedes that Berry, Rozycki, Craig, McCormick, and Glover, as well as Hicks, are employed in the same division as Lenihan and that they receive greater annual salaries than she.

Lenihan contends that Boeing officials in Huntsville recognized this gender-based disparity in salary and promised to rectify the situation. Specifically, Lenihan's former supervisor allegedly announced at a meeting that there was extra money which would be used for salary increases scheduled for November 1995 "to try to get the women in line with the men." Also, Hardy purportedly advised Lenihan that she would receive double raises or substantial increases to "catch her up with the guys." Nevertheless, despite three merit increases, Lenihan alleges that her salary is not commensurate with that of her male coworkers. Lenihan maintains that this constitutes a breach of a contract that Boeing made with her to "fast track" her raises and get her salary "in line with the men."

Lenihan also alleges that Boeing has committed sex-based discrimination against her in its award of paid overtime hours and promotions. Specifically, Lenihan asserts that Boeing permits Hicks to work more overtime than she. As to promotions, Lenihan contends that as early as 1989, Billy Hughes ("Hughes"), the business manager for the space station program at Huntsville, promised Lenihan a supervisory position. In May 1991, Hughes again allegedly promised Lenihan that she would be promoted to a supervisory position within a year. She maintains that, while she worked in Huntsville, she followed the procedures established by Boeing to obtain a management position. Specifically, she attended Boeing's pre-management and management courses in Wichita, Kansas, and notified her supervisor, Hardy, of her desire to be considered for management positions. Despite this, she contends that she was never notified of the existence of a supervisory position until it had been filled by Jim Svetz ("Svetz") around September 1991. Lenihan alleges that this violated Boeing's policies as enunciated in a July 1990 memorandum entitled "Selection for Management Positions." She does not, however, explain the manner in which this promotion violated Boeing's policies.

The position awarded to Svetz entailed the supervision of Lenihan's group, the property management group, and Lenihan asserts that she was qualified for the position. Contradicting her other statements that she was not aware of the position until it was awarded, Lenihan asserts that she informed Hardy of her interest in the position assigned to Svetz. After learning that Svetz had been selected for the position, Lenihan met with Evangeline T. MacCrone ("MacCrone")—Boeing's employee services supervisor in Huntsville—on October 1, 1991, to complain about Svetz's selection despite her excellent qualifications for a management position. Lenihan also alleges that, when she subsequently com-

plained to Ken Miller ("Miller") about Svetz's selection, Miller advised Lenihan that her lack of a college education and communication skills precluded her from being considered for the position. Lenihan asserts that this policy is contrary to a Boeing policy that "four years experience at Boeing is credited as the equivalent of a college degree." Ultimately, Svetz did not assume the position; it was filled by Earl Garner ("Garner") through a lateral transfer. Lenihan also asserts that she was more qualified for the position than Garner.

Lenihan further complains that she was not promoted to a manufacturing supervisory position in Huntsville, which Rozycki obtained in 1993 or 1994.[1] She stated in her deposition, however, that she does not know what duties or expertise this position entails, and she is unsure whether she is qualified for the position. Boeing points out that, during the time candidates were being considered for the position, Lenihan was working for Boeing in Houston and that she did not apply for the position. Therefore, according to Boeing, "as a matter of consistently applied, neutral business practices," Lenihan was not considered for the position. Moreover, Boeing asserts that Rozycki was more qualified than Lenihan for this position. Rozycki's experience includes eight years of exempt level experience at Boeing, preceded by a twenty-two year career in the United States Navy that entailed extensive management level experience. In contrast, Lenihan had five years of nonexempt experience in manufacturing and less than four years experience at an exempt level.

Lenihan also complains that she was discriminated against when she was not considered or promoted to the "PP & C" or "total planner" position in Huntsville that Berry obtained in 1994 or 1995.[2] She admits that Berry is "very well-qualified" for the position, but asserts that she is equally qualified for the position. She has not alleged, however, that she applied for this position or that her qualifications are superior to those of Berry. As with the position awarded Rozycki, Boeing contends that Lenihan was not considered for this position because she was working in Houston. Further, the company maintains that Berry's nine years of exempt level experience at Boeing made him more qualified for the position than Lenihan.

As further evidence of alleged sexual discrimination in promotions, Lenihan notes that in her seventeen-year tenure with Boeing she has served with only one female supervisor or manager. Testimony from other employees corroborates this paucity of females in management positions. Lenihan admits, however, that, in 1996, Boeing's Tom Dailey ("Dailey"), urged her to apply for two management positions in Huntsville. Lenihan sent a resume to him, but the positions were never filled due to budgetary constraints and a reorganization of the Huntsville office. Lenihan contends that this failure to promote her was also an act of sexual discrimination. Since Boeing instituted a posting system for openings, sometime around 1996, Lenihan has not applied for any management positions and is no longer interested in obtaining one. Lenihan also admits that, for at least some of the relevant time period, there were no available openings to which she could have been promoted. She further concedes that, while employed by Boeing, she received two promotions. Her promotion to an exempt level position in 1991 occurred when she had less tenure with Boeing than some of her male coworkers.

In addition, Lenihan contends that she has been sexually harassed by two Boeing employees. Specifically, she alleges that Boeing, through Garner, Lenihan's former supervisor, promoted, endorsed, and ratified comments to the effect that women should stay in the home and that Boeing is no place for a woman to work. She alleges that Hicks made similar comments in her presence. Additionally, at company meetings, Garner would purportedly ignore Lenihan's suggestions or order her to "shut up." He also reportedly did not select her to attend a planning conference within her area of responsibility and competence and excluded her from meetings with other Boeing groups

1. Boeing asserts that Rozycki assumed this position in February 1995.

2. Boeing maintains that Berry was promoted to the "total planner" position in October 1995.

and customers. Complaints from Lenihan about these matters allegedly resulted in responses from Garner about her being an "aggressive female." Lenihan also alleges that males receive preferential treatment in the assignment, of tasks requiring higher levels of expertise and training and that, unlike males, she must do her own data entry. Further, according to Lenihan, tasks and information relevant to her expertise are diverted away from her to male employees. Male coworkers allegedly review correspondence within Lenihan's scope of responsibility and prevent her from viewing certain aspects of the correspondence. These activities purportedly continue despite Lenihan's objections.

Lenihan filed two charges of discrimination with the Texas Human Rights Commission and the EEOC on November 16, 1995. In those charges she complains of sexual discrimination and harassment in violation of Title VII, the Equal Pay Act ("EPA"), and the Texas Human Rights Act. Lenihan filed the instant lawsuit on May 16, 1996, alleging sexual discrimination in violation of Title VII and the EPA as well as breach of contract. She is seeking a permanent injunction enjoining Boeing from violating Title VII, actual damages, punitive damages, prejudgment and postjudgment interest, attorneys' fees, and court costs.

## II. *Analysis*

### A. *Summary Judgment Standard*

Rule 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,*

477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Williams v. Adams,* 836 F.2d 958, 960 (5th Cir.1988). The moving party, however, need not negate the elements of the nonmovant's case. *See Wallace v. Texas Tech Univ.,* 80 F.3d 1042, 1047 (5th Cir. 1996) (citing *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994)).

Once a proper motion has been made, the nonmoving party may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts showing the existence of a genuine issue for trial. *See Celotex Corp.,* 477 U.S. at 322–23; *Anderson,* 477 U.S. at 257; *Wallace,* 80 F.3d at 1047; *Little,* 37 F.3d at 1075. All evidence must be "construed in the light most favorable to the nonmoving party without weighing the evidence, assessing its probative value, or resolving any factual disputes." *See Williams v. Time Warner Operation, Inc.,* 98 F.3d 179, 181 (5th Cir.1996) (citing *Lindsey v. Prive Corp.,* 987 F.2d 324, 327 n. 14 (5th Cir.1993)). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in her favor." *Palmer v. BRG of Ga., Inc.,* 498 U.S. 46, 49 n. 5, 111 S.Ct. 401, 112 L.Ed.2d 349 (1990) (quoting *Anderson,* 477 U.S. at 255). Nevertheless, "conclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy the nonmovant's burden." *Douglass v. United Serv. Auto. Ass'n,* 79 F.3d 1415, 1429 (5th Cir.1996) (citing *Forsyth v. Barr,* 19 F.3d 1527, 1533 (5th Cir.), *cert. denied,* 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994)); *see Wallace,* 80 F.3d at 1047; *Little,* 37 F.3d at 1075. Summary judgment is mandated if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to her case on which she bears the burden of proof at trial. *See Celotex Corp.,* 477 U.S. at 322. "In such situation, there can be 'no genuine issue as to any material fact' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23.

### B. *Sexual Discrimination Under Title VII*

#### 1. *Statute of Limitations*

In Texas, to sustain a Title VII claim, a plaintiff must file her charge of discrimina-

tion within 300 days of the "alleged unlawful employment practice." *See* 42 U.S.C. § 2000e–5(e); *Anson v. University of Tex. Health Science Ctr.*, 962 F.2d 539, 540 (5th Cir.1992). Generally, the limitations period begins on the date the discriminatory act occurred, and a plaintiff cannot sustain her claims based on incidents occurring prior to the 300–day period. *See Waltman v. International Paper Co.*, 875 F.2d 468, 474 (5th Cir.1989). Any act occurring outside the applicable filing period "may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue, but separately considered, it is merely an unfortunate event in history which has no present legal consequences." *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977); *see Ray v. Tandem Computers, Inc.*, 63 F.3d 429, 434 n. 12 (5th Cir.1995); *Cortes v. Maxus Exploration Co.*, 977 F.2d 195, 199 (5th Cir.1992); *Merrill v. Southern Methodist Univ.*, 806 F.2d 600, 604 n. 5 (5th Cir.1986); *Downey v. Southern Natural Gas Co.*, 649 F.2d 302, 305 (5th Cir.1981).

■ The courts, however, have recognized an equitable exception "where the unlawful employment practice manifests itself over time, rather than as a series of discrete acts." *Waltman*, 875 F.2d at 474; *Abrams v. Baylor College of Medicine*, 805 F.2d 528, 532 (5th Cir.1986). In order to extend the statute of limitations period under this exception, known as a continuing violation, the plaintiff must file an EEOC charge within at least 300 days of one of the alleged acts of discrimination. *See Waltman*, 875 F.2d at 474; *see also Delaware State College v. Ricks*, 449 U.S. 250, 258, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980). "A continuing violation is one that could not reasonably have been expected to be made the subject of a lawsuit when it first occurred because its character as a violation did not become clear until it was repeated during the limitations period." *See Dasgupta v. University of Wis. Bd. of Regents*, 121 F.3d 1138, 1139 (7th Cir.1997) (citing *Rush v. Scott Specialty Gases, Inc.*, 113 F.3d 476, 481–82 (3d Cir.1997); *Galloway v. General Motors Serv. Parts Operations*, 78 F.3d 1164, 1167 (7th Cir.1996); *Berry v. Board of Supervisors of L.S.U.*, 715 F.2d 971, 981 (5th Cir.1983)). The continuing violation theory relieves a plaintiff of establishing that all of the discriminatory conduct occurred within the limitations period if the plaintiff can show a series of related acts, at least one of which occurred within the limitations period. *See Messer v. Meno*, 130 F.3d 130, 135 (5th Cir. 1997).

■ The purpose behind allowing a plaintiff to maintain a cause of action under the continuing violation theory is to permit redress for acts the discriminatory character of which was not apparent at the time they occurred. *See Speer v. Rand McNally & Co.*, 123 F.3d 658, 663–64 (7th Cir.1997); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 446 (7th Cir.1994). A continuing violation tolls the statute of limitations because such statutes are meant only to prevent stale claims. *See McGregor v. Louisiana State Univ. Bd. of Supervisors*, 3 F.3d 850, 867 (5th Cir.1993) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982), *cert. denied*, 510 U.S. 1131, 114 S.Ct. 1103, 127 L.Ed.2d 415 (1994)). " 'Where the challenged violation is a continuing one, the staleness concern disappears.' " *Id.; see also Glass v. Petro–Tex Chem. Corp.*, 757 F.2d 1554, 1560 (5th Cir. 1985). If none of the alleged acts occurred within 300 days of the filing of the EEOC charge, however, the plaintiff's cause of action for employment discrimination is time-barred. *See Delaware State College*, 449 U.S. at 258; *Waltman*, 875 F.2d at 474–75; *Abrams*, 805 F.2d at 533. The Fifth Circuit has cautioned that "[t]his theory of continuing violation has to be guardedly employed because within it are the seeds of destruction of the statute of limitation in Title VII cases." *Abrams*, 805 F.2d at 533.

■ The Fifth Circuit has adopted a multi-factor test to determine the existence of a continuing violation. *See Berry*, 715 F.2d at 981. These factors include subject matter, frequency, and permanence.

This inquiry, of necessity, turns on the facts and context of each particular case. Relevant to the determination are the following three factors, which we discuss, but by no means consider to be exhaustive.

The first is subject matter. Do the alleged facts involve the same type of discrimination, tending to connect them in a continuing violation? The second is frequency. Are the alleged acts recurring (e.g., a bi-weekly paycheck) or more in the nature of an isolated work assignment or employment decision? The third factor, perhaps of most importance, is degree of permanence which should trigger an employee's awareness and duty to assert his or her rights, or which should indicate to the employee that the continued existence of the adverse consequences of the act is to be expected without being dependent on a continuing intent to discriminate?

*Id.* "The focus is on what event, in fairness and logic, should have alerted the average lay person to act to protect h[er] rights." *Glass,* 757 F.2d at 1561 (citations omitted); *see also Messer,* 130 F.3d at 135; *Abrams,* 805 F.2d at 534.

■ In analyzing the permanence factor, the court examines whether a discrete event triggered a duty of the plaintiff to assert her rights. *See Waltman,* 875 F.2d at 476. Basically, permanence is an inquiry into what the plaintiff knew or should have known at the time of the discriminatory act. *See Sabree v. United Bhd. of Carpenters & Joiners,* 921 F.2d 396, 402 (1st Cir.1990). If a plaintiff knows or with the exercise of reasonable diligence would have known that she suffered from discrimination, she "may not sit back and accumulate all the discriminatory acts and sue on all within the statutory period applicable to the last one." *Moskowitz v. Trustees of Purdue Univ.,* 5 F.3d 279, 282 (7th Cir.1993). Thus, as the First Circuit noted:

A knowing plaintiff has an obligation to file promptly or lose his claim. This can be distinguished from a plaintiff who is unable to appreciate that he is being discriminated against until he has lived through a series of acts and is thereby able to perceive the overall discriminatory pattern.

*Sabree,* 921 F.2d at 402; *Martin v. Frank,* 788 F.Supp. 821, 826 (D.Del.1992).

■ The Fifth Circuit has recognized that "[a]cts of harassment that create an offensive or hostile work environment generally do not

have the same degree of permanence as, for example, the loss of promotion." *Waltman,* 875 F.2d at 476; *see West v. Philadelphia Elec. Co.,* 45 F.3d 744, 755–56 (3d Cir.1995). In the latter example, there is an element of permanence to the discriminatory action that should, in most cases, alert a plaintiff that his rights have been violated. *See Stair v. Lehigh Valley Carpenters Local Union No. 600,* 813 F.Supp. 1112, 1116 (E.D.Pa.1993).

■ In the case at bar, it is undisputed that Lenihan did not file an EEOC charge within 300 days after the first incident of purported discrimination in promotion involving Svetz, which occurred prior to 1995. Instead, Lenihan waited until November 16, 1995, to file a charge of discrimination with the EEOC. Therefore, with respect to her failure to promote claim, unless a continuing violation is established, Lenihan may recover only for conduct that occurred on or after January 20, 1995, 300 days before November 16, 1995. At deposition, Lenihan testified that she complained to Boeing about its failure to promote her to the Svetz position shortly after it occurred. This testimony indicates actual knowledge of perceived discriminatory treatment and constitutes sufficient notice to alert an employee that an unachieved promotion might be based on a discriminatory motive. *See Waltman,* 875 F.2d at 476. Conversely, the failure to promote has such a degree of permanence that a reasonably prudent person would have appreciated that she was being discriminated against when she failed to receive the promotion sought. *See Alldread v. City of Grenada,* 988 F.2d 1425, 1432 (5th Cir.1993); *Glass,* 757 F.2d at 1560; *see also Philadelphia Elec. Co.,* 45 F.3d at 755; *Weeks v. Coury,* 951 F.Supp. 1264, 1270 (S.D.Tex. 1996); *Hershey v. Praxair, Inc.,* 948 F.Supp. 29, 32 (S.D.Tex.1996). Lenihan's failure to promote claim as to the Svetz position addresses a discrete instance of alleged discrimination that has a permanence precluding a continuing violation analysis. *See Rush,* 113 F.3d at 483; *Weeks,* 951 F.Supp. at 1270. The events as she describes them would have alerted the average lay person to act to protect her rights. *See Alldread,* 988 F.2d at 1432. "A knowing plaintiff has the

obligation to file promptly or lose [her] claim." *Smith v. Bath Iron Works Corp.*, 943 F.2d 164, 166 (1st Cir.1991). "If she believed [her employer] was not considering her for available positions as promised, she should have reacted at that time. Waiting to see what would happen next was pointless; the harm, if any, was already inflicted." *Rush*, 113 F.3d at 483.

Accordingly, the continuing violation theory is not available to Lenihan, and consequently, her claims of sex discrimination in promotion based on events occurring prior to January 20, 1995, are time-barred.

### 2. *Burden of Proof*

■ Title VII provides that "[i]t shall be an unlawful employment practice for an employer—(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). In *McDonnell Douglas* and *Burdine*, the United States Supreme Court outlined the burden-shifting framework generally applicable in employment discrimination cases brought under Title VII. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Where there is no direct evidence of discrimination, a plaintiff must initially establish a *prima facie* case by satisfying a four-element test from which a discriminatory motive may be inferred, thus creating a rebuttable presumption of intentional discrimination. *See Wallace*, 80 F.3d at 1047 (citing *Meinecke v. H & R Block of Houston*, 66 F.3d 77, 83 (5th Cir.1995)); *Davis v. Chevron U.S.A., Inc.*, 14 F.3d 1082, 1087 (5th Cir.1994) (citing *Burdine*, 450 U.S. at 252–53). Once the plaintiff establishes a *prima facie* case, then the burden shifts to the defendant to articulate—but not prove—a legitimate, nondiscriminatory reason for its employment decision. *See McDonnell Douglas Corp.*, 411 U.S. at 802; *Davis*, 14 F.3d at 1087; *see also Marcantel v. Department of Transp. & Dev.*, 37 F.3d 197,

199 (5th Cir.1994). If the employer meets its burden, the *prima facie* case is dissolved, and the burden shifts back to the plaintiff to establish that the reason proffered by the employer is merely a pretext for discrimination. *See McDonnell Douglas Corp.*, 411 U.S. at 802; *Travis v. Board of Regents of the Univ. of Tex. Sys.*, 122 F.3d 259, 263 (5th Cir.1997); *Marcantel*, 37 F.3d at 200; *Moham v. Steego Corp.*, 3 F.3d 873, 875 (5th Cir.1993), *cert. denied*, 510 U.S. 1197, 114 S.Ct. 1307, 127 L.Ed.2d 658 (1994). To demonstrate a "pretext for discrimination," the plaintiff must show both that the employer's proffered reason is false and that discrimination was the real reason. *See St. Mary's Honor Ctr.*, 509 U.S. at 515; *Walton v. Bisco Indus., Inc.*, 119 F.3d 368, 370 (5th Cir.1997); *Grimes v. Texas Dep't of Mental Health & Mental Retardation*, 102 F.3d 137, 140–41 (5th Cir.1996); *Polanco v. City of Austin*, 78 F.3d 968, 977 (5th Cir.1996); *Marcantel*, 37 F.3d at 200; *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 959 n. 8. (5th Cir.1993). At all times, however, the plaintiff has the ultimate burden to prove intentional discrimination. *See St. Mary's Honor Ctr.*, 509 U.S. at 507; *Marcantel*, 37 F.3d at 200.

■ The Fifth Circuit has formulated the plaintiff's burden under *St. Mary's Honor Ctr.* as one of establishing that the employer's nondiscriminatory reason is not credible and that an unlawful discriminatory intent motivated the employer's action. *See Ray v. Iuka Special Mun. Separate Sch. Dist.*, 51 F.3d 1246, 1249 (5th Cir.1995). "Under *Hicks*, '[i]t is not enough, in other words, to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination.'" *Id.* (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 519). "The question is not whether an employer made an erroneous decision; it is whether the decision was made with discriminatory motive." *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1091 (5th Cir.1995); *accord Odom v. Frank*, 3 F.3d 839, 850 (5th Cir. 1993); *Little v. Republic Refining Co.*, 924 F.2d 93, 97 (5th Cir.1991). In the context of a motion for summary judgment, "[a] jury issue will be presented and a plaintiff can avoid summary judgment ... if the evidence taken as a whole (1) creates a fact issue as

to whether each of the employer's stated reasons was what actually motivated the employer and (2) creates a reasonable inference that [plaintiff's protected status] was a determinative factor in the actions of which the plaintiff complains." *Rhodes v. Guiberson Oil Tools,* 75 F.3d 989, 994 (5th Cir.1996). The burden-shifting approach may be dispensed with altogether, however, if the plaintiff is able to establish intentional discrimination by direct evidence of discriminatory motive. *See Wallace,* 80 F.3d at 1047–48; *Kendall v. Block,* 821 F.2d 1142, 1145 (5th Cir.1987); *Ramirez v. Sloss,* 615 F.2d 163, 168 (5th Cir.1980).

Nevertheless, an employee's own subjective belief of discrimination, no matter how genuine, cannot serve as the basis for judicial relief. *See, e.g., Nichols v. Loral Vought Sys. Corp.,* 81 F.3d 38, 42 (5th Cir. 1996); *Douglass,* 79 F.3d at 1429; *Ray,* 63 F.3d at 434; *Armendariz v. Pinkerton Tobacco Co.,* 58 F.3d 144, 152–53 (5th Cir.1995), *cert. denied,* 516 U.S. 1047, 116 S.Ct. 709, 133 L.Ed.2d 664 (1996); *EEOC v. Louisiana Office of Community Servs.,* 47 F.3d 1438, 1448 (5th Cir.1995); *Portis v. First Nat'l Bank of New Albany,* 34 F.3d 325, 329 (5th Cir.1994); *Grizzle v. Travelers Health Network, Inc.,* 14 F.3d 261, 268 (5th Cir.1994); *Molnar v. Ebasco Constructors, Inc.,* 986 F.2d 115, 119 (5th Cir.1993); *Republic Refining Co.,* 924 F.2d at 96. Although Title VII protects employees against discrimination in the terms and conditions of employment, it does not afford minorities special preference or place upon the employer an affirmative duty to accord such persons special treatment. *See* 42 U.S.C. § 2000e–2(j); *see also Burdine,* 450 U.S. at 259; *Sessions v. Rusk State Hosp.,* 648 F.2d 1066, 1071 (5th Cir.1981); *Wynn v. Columbus Mun. Separate Sch. Dist.,* 692 F.Supp. 672, 684 (N.D.Miss.1988). Furthermore, the employment discrimination laws are "not intended to be a vehicle for judicial second-guessing of business decisions, nor ... to transform the courts into personnel managers." *Louisiana Office of Community Servs.,* 47 F.3d at 1448 (citing *Bienkowski v. American Airlines, Inc.,* 851 F.2d 1503, 1507–08 (5th Cir.1988)); *Bodenheimer,* 5 F.3d at 959; *see also Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 578, 98

S.Ct. 2943, 57 L.Ed.2d 957 (1978); *Walton,* 119 F.3d at 372; *Waggoner v. City of Garland,* 987 F.2d 1160, 1165 (5th Cir.1993). Because Lenihan has not produced direct evidence of discriminatory motive, this court must employ the burden-shifting framework of *St. Mary's Honor Ctr.*

### 3. Lenihan's Claims

#### a. Sexual Harassment

Two principal theories of sexual harassment are cognizable under Title VII—hostile work environment and *quid pro quo. See Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). A cause of action for hostile work environment requires the existence of severe or pervasive and unwelcome verbal or physical harassment of the plaintiff due to the plaintiff's membership in a protected class. *See Vinson,* 477 U.S. at 66–67; *Sischo–Nownejad v. Merced Community College Dist.,* 934 F.2d 1104, 1109 (9th Cir.1991); *Young v. Will County Dep't of Pub. Aid,* 882 F.2d 290, 294 (7th Cir.1989); *Jones v. Flagship Int'l,* 793 F.2d 714, 719–20 (5th Cir.1986), *cert. denied, 479* U.S. 1065, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987).

Hostile work environment sexual harassment occurs when an employer's conduct "has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." *Vinson,* 477 U.S. at 65. The United States Supreme Court has confirmed that sexually discriminatory verbal intimidation, ridicule, and insults may be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment that violates Title VII. *See Harris v. Forklift Sys. Inc.,* 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (citing *Vinson,* 477 U.S. at 65, 67). Whether the asserted conduct is sufficiently pervasive to create a hostile or offensive work environment must be determined from the totality of the circumstances. *See id.* 510 U.S. at 23; *Farpella–Crosby v. Horizon Health Care,* 97 F.3d 803, 806 (5th Cir.1996). In determining whether a work environment is hostile, the

court should consider such factors as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. The test is an objective, rather than a subjective, one. *See Weller v. Citation Oil & Gas Corp.*, 84 F.3d 191, 194 (5th Cir.1996), *cert. denied*, ─── U.S. ───, 117 S.Ct. 682, 136 L.Ed.2d 607 (1997); *DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 594 (5th Cir.1995) (citing *Harris*, 510 U.S. at 19–20). Further, sexual harassment is "behavior that would not occur but for the sex of the employee. If the nature of an employee's environment, however unpleasant, is not due to her gender, she has not been the victim of sex discrimination." *Winsor v. Hinckley Dodge, Inc.*, 79 F.3d 996, 999 (10th Cir.1996) (citation and internal quotations omitted); *Bolden v. PRC, Inc.*, 43 F.3d 545, 551 (10th Cir.1994), *cert. denied*, 516 U.S. 826, 116 S.Ct. 92, 133 L.Ed.2d 48 (1995).

The Fifth Circuit has set forth five elements necessary to establish a *prima facie* case of sexual harassment in the work place:

(1) the plaintiff belongs to a protected class;

(2) the plaintiff was subjected to unwelcome harassment;

(3) the harassment was based on sex;

(4) the harassment affected a term, condition, or privilege of employment; and

(5) the employer either knew or should have known of the harassment and failed to take prompt remedial action.

*See Farpella–Crosby*, 97 F.3d at 806; *Weller*, 84 F.3d at 194; *DeAngelis*, 51 F.3d at 593; *Nash v. Electrospace Sys., Inc.*, 9 F.3d 401, 403 (5th Cir.1993); *Cortes*, 977 F.2d at 198–99.

Lenihan satisfies the first element by virtue of her gender. As to the second and third elements, Lenihan complains that Garner and Hicks made comments suggesting that women should stay in the home and that Boeing is no place for a woman to work.

At deposition, she testified with regard to Garner, "I've had to listen to comments to do with his wife and daughter that I felt like showed his opinion on, that women should stay at home or that it's a good thing for them to be at home, in general ...." Further, according to Lenihan, Garner and Hicks ignored her suggestions or ordered her to remain quiet, and Garner did not select her to attend a planning conference within her area of responsibility and competence. Lenihan also alleges that Garner sexually harassed her by failing to invite her to meetings which related to her areas of expertise. She has not detailed the frequency of these purported occurrences or their duration other than to state that Garner walked away while she was talking three or four times a week. Finally, Lenihan contends that Garner reassigned tasks "to other work groups or to male employees within his own group without notifying Lenihan and without any justification for the reassignment."

The courts of appeal have provided guidance on the question as to what constitutes sexual harassment under Title VII. "Casual or isolated manifestations of discriminatory conduct, such as a few sexual comments or slurs, may not support a cause of action." *Lowe v. Angelo's Italian Foods, Inc.*, 87 F.3d 1170, 1175 (10th Cir.1996) (requiring that the plaintiff not wear red, commenting no skirts in the kitchen, and using the term "girlie" to refer to the plaintiff does not constitute actionable sexual harassment); *see also Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1456 (7th Cir.1994). The Seventh Circuit considered a case where the plaintiff's superior called her "pretty girl," grunted as the plaintiff left his office, informed the plaintiff that his office became hot only after she arrived, told the plaintiff that he left the Christmas party early because there were so many pretty girls there that he "didn't want to lose control," and informed the plaintiff that it was lonely in his hotel room because his wife had not moved to town. *See Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir.1995). The court held that these and similar incidents spread over a seven-month period did not constitute sexual harassment. *See id.; see also Weiss v.*

*Coca–Cola Bottling Co.*, 990 F.2d 333, 336–37 (7th Cir.1993) (no actionable harassment although plaintiff's supervisor jokingly called her a "dumb blonde," placed his hand on her shoulder several times, placed "I love you" signs in her work area, attempted to kiss her, and asked her out on dates).

Other courts have similarly found that conduct far more egregious than that ascribed to Hicks and Garner does not constitute sexual harassment as a matter of law. In one case, the plaintiff alleged that her manager referred to female customers as "bitchy" or "dumb," appeared to be ogling other female employees, flirted with an employee's female relatives, commented on one co-worker's anatomy, informed employees he spent weekends at a nudist camp, and told the employee that he dreamed of holding her hand. *See Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1143 (7th Cir.1997). The court, nevertheless, held that this conduct was not actionable sexual harassment. *See id.; see also Hartsell v. Duplex Prod., Inc.*, 123 F.3d 766, 772 (4th Cir.1997) (holding that the following comments were not sexual harassment actionable under Title VII: "We've made every female in this office cry like a baby;" "mini van driving mommy;" "be a salesperson and play with the big boys;" "go home and fetch [her] husband's slippers like a good little wife"); *see also Dornhecker v. Malibu Grand Prix Corp.*, 828 F.2d 307, 309 (5th Cir.1987). Finally, courts have determined that the following activities did not constitute sexual harassment: telling plaintiff, while looking at her in a suggestive manner, that there was nothing the supervisor liked more than sticky buns; informing the plaintiff that she was "paid great money for a woman;" laughing when the plaintiff pronounced a name that sounded like "bosom"; asking the plaintiff "weren't you there Saturday night dancing on the tables?"; and stating "just get the broad to sign it." *See Black v. Zaring Homes, Inc.*, 104 F.3d 822, 826 (6th Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 172, 139 L.Ed.2d 114 (1997); *see also Hopkins v. Baltimore Gas & Elec. Co.*, 77 F.3d 745, 753 (4th Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 70, 136 L.Ed.2d 30 (1996); *Morgan v. Massachusetts Gen. Hosp.*, 901 F.2d 186, 193 (1st Cir.1990).

Here, none of the activities of which Lenihan complains is overtly sexual in nature. Lenihan admitted as much at her deposition and further agreed that she was not propositioned for sex or anything "remotely like that." Similarly, Lenihan has not alleged that Garner or Hicks used derogatory terms to refer to women or that they improperly touched her. She has made no allegations of sexually offensive jokes being told in her presence or that anyone at Boeing raised their voice when addressing her. Notably, Lenihan stated that the primary object of her complaint, Garner, was and is still her friend.

In short, Lenihan's allegations are a far cry from the pervasive and intimidating harassment that Title VII targets. "The concept of sexual harassment is designed to protect working women from the kind of male attentions that can make the workplace hellish for women." *Baskerville*, 50 F.3d at 430. "[O]nly the most serious sexual harassment can be the basis of a federal suit under Title VII." *Valdez v. Church's Fried Chicken, Inc.*, 683 F.Supp. 596, 620 (W.D.Tex.1988). Lenihan's description of her workplace, however, is hardly hellish. Viewed objectively, or subjectively through Lenihan's deposition testimony, her work environment was not abusive or plagued with demeaning conduct. She admits than none of her superiors or coworkers made any vulgar or sexually offensive comments about women. For example, in her deposition testimony, Lenihan recounted one of Garner's typical acts of "sexual harassment":

> Earl has described to me—has told me many, many stores [sic] about his daughters and his wife that are very positive, warm mother and child stories, grandmother and child stories in our relationship at work. We're friends. Okay.
>
> Now Earl—Earl's family, you know, I don't mean anything derogatory about his wife or his daughter. I think they're fine. But Earl's opinion to me or how it makes me feel is that Earl thinks that's the way life should be, that women should be at home nurturing their children, you know, keeping their home, that kind of thing.

Similarly, Lenihan described the type of comments made by Hicks that she considers to be sexual harassment:

> Every time—almost every time he refers to her [his wife] it's Little Annie. Little Annie doing this, Little Annie baked cookies, Little Annie went to Randall's and bought too much cake. You know, he would bring in the leftover cake for us to have at work. It's just—he acts—he acts like she's there as his right hand and that she's there to take care of him and it's dismissive to me to women for a guy to have an attitude like that about any woman, that that's what she's there to do and that's what he thinks she's there to do.

The working conditions described by Lenihan, when viewed objectively, do not approach actionable sexual harassment. At worst, she has been assigned to work with male employees whose wives or daughters have chosen to be homemakers, and the employees are appreciative of their domestic endeavors. Title VII, however, was not enacted to regulate the relationships between supervisors or employees and their families, but to provide equal opportunities in the workplace. *See Griggs v. Duke Power Co.,* 401 U.S. 424, 429–31, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) (the objective of Title VII was to "achieve equality of employment opportunities"). There is no indication from these comments that Garner or Hicks believed that all women, or Lenihan in particular, should not work outside the home. It is only Lenihan's subjective belief that Garner's and Hick's remarks were directed at her or are belittling to women in general. Yet, an employee's own subjective belief of discrimination is not actionable. *See, e.g., Nichols,* 81 F.3d at 42; *Douglass,* 79 F.3d at 1429. When the evidence adduced by Lenihan is assessed objectively, it is apparent that she has not satisfied the second or third prongs of a *prima facie* case of sexual harassment.

■ With respect to the fourth element, Boeing claims that it did not alter Lenihan's working conditions or create an abusive environment. A working environment is abusive "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently se-

vere or pervasive to alter the conditions of the victim's employment and create an abusive working environment."' *Harris,* 510 U.S. at 23 (quoting *Vinson,* 477 U.S. at 65). It is evident from Lenihan's description of her workplace that it is not permeated with ridicule and insult. Rather, Lenihan's testimony reflects that she has not been subjected to an abusive working environment while employed by Boeing. Thus, Lenihan has failed to establish the fourth element of a *prima facie* case of sexual harassment. Consequently, in the absence of actionable harassment, Boeing had no obligation to take prompt remedial action under the fifth prong of a *prima facie* case. Therefore, Lenihan is unable to establish a *prima facie* case of sexual harassment.

Accordingly Lenihan's sexual discrimination claim based on sexual harassment provides no basis for relief under Title VII.

b. *Failure to Promote*

■ In order to establish a *prima facie* case of failure to promote under Title VII, a plaintiff must show that:

(1) she is a member of a protected group;

(2) she sought or applied for a position for which she was qualified;

(3) she was rejected; and

(4) after she was rejected, the employer promoted or continued to seek other candidates not in the protected group.

*See Grimes,* 102 F.3d at 140; *see also Brill v. Lante Corp.,* 119 F.3d 1266, 1270 (7th Cir. 1997); *Combs v. Plantation Patterns,* 106 F.3d 1519, 1539 (11th Cir.1997), *cert. denied,* — U.S. —, 118 S.Ct. 685, 139 L.Ed.2d 632 (1998) (No. 97–361); *Evans v. Technologies Applications & Serv. Co.,* 80 F.3d 954, 959–60 (4th Cir.1996); *Jones,* 793 F.2d at 724.

■ The *prima facie* case is a flexible standard that may be modified to relate to different factual situations. *See Brill,* 119 F.3d at 1270; *Isenbergh v. Knight–Ridder Newspaper Sales, Inc.,* 97 F.3d 436, 440 (11th Cir.1996), *cert. denied,* — U.S. —, 117

S.Ct. 2511, 138 L.Ed.2d 1014 (1997); *Wohl v. Spectrum Mfg., Inc.*, 94 F.3d 353, 358 (7th Cir.1996). Accordingly, courts have excused an employee's failure to apply for a position in a variety of situations. For example, a formal application is not a necessary aspect of a plaintiff's *prima facie* case when such a gesture would be futile. *See International Bhd. of Teamsters v. United States*, 431 U.S. 324, 365, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *Chambers v. Wynne Sch. Dist.*, 909 F.2d 1214, 1217 (8th Cir.1990) (failure to apply formally will be excused if plaintiff makes every reasonable attempt to convey interest in job to employer); *Easley v. Empire, Inc.*, 757 F.2d 923, 930 n. 7 (8th Cir. 1985). In such a case, however, the plaintiff must present "overwhelming evidence of pervasive discrimination in all aspects of the employer's internal employment practices." *Kreuzer v. Brown*, 128 F.3d 359, 363 n. 2 (6th Cir.1997) (quoting *Harless v. Duck*, 619 F.2d 611, 617–18 (6th Cir.), *cert. denied*, 449 U.S. 872, 101 S.Ct. 212, 66 L.Ed.2d 92 (1980)); *see also Monfort, Inc. v. NLRB*, 965 F.2d 1538, 1546 (10th Cir.1992).

▮ Similarly, a formal application will not be required where a vacant position was not posted or where the normal hiring procedures did not entail formal application. *See EEOC v. Metal Serv. Co.*, 892 F.2d 341, 348 (3d Cir.1990); *Paxton v. Union Nat'l Bank*, 688 F.2d 552, 568 (8th Cir.1982), *cert. denied*, 460 U.S. 1083, 103 S.Ct. 1772, 76 L.Ed.2d 345 (1983); *Royal v. Missouri Highway Transp. Comm'n*, 655 F.2d 159, 163 n. 5 (8th Cir. 1981); *Simon v. Honeywell, Inc.*, 642 F.2d 754, 755 n. 3 (5th Cir.1981). In these situations, however, the plaintiff must show there was an available position and that she expressed some interest in a promotion or that the employer "has some reason or duty to consider [her] for the post." *Kehoe v. Anheuser–Busch*, 96 F.3d 1095, 1105 n. 13 (8th Cir.1996) (citing *Fowle v. C & C Cola*, 868 F.2d 59, 68 (3d Cir.1989)); *see also Gafford v. General Elec. Co.*, 997 F.2d 150, 169 (6th Cir.1993); *Jones*, 793 F.2d at 724; *Holsey v. Armour & Co.*, 743 F.2d 199, 208–09 (4th Cir.1984), *cert. denied*, 470 U.S. 1028, 105 S.Ct. 1395, 84 L.Ed.2d 784 (1985); *Carmichael v. Birmingham Saw Works*, 738 F.2d 1126, 1133 (11th Cir.1984); *Goff v. Continen-tal Oil Co.*, 678 F.2d 593, 596 n. 2 (5th Cir.1982).

▮ Even if Lenihan were not time-barred from bringing a discrimination claim as to the Svetz position by the statute of limitations, she nevertheless has failed to establish a *prima facie* case of promotion discrimination. Admittedly, Lenihan has established the first *prima facie* element because, as a woman, she is a member of a protected class under Title VII. With respect the second element, however, Lenihan never applied for or specifically expressed an interest in any of the positions to which she now contends she should have been promoted.

With respect to the position awarded to Svetz, Lenihan testified that she was not even aware of the position until it was filled. Further, Lenihan does not assert that she submitted a resume, a formal application, or even an informal note seeking the position. This is also true with respect to the positions awarded to Rozycki and Berry. While courts have excused an employee's failure to apply for a position when such a gesture would have been futile, Lenihan does not make that assertion here. *See Chambers*, 909 F.2d at 1217. Even if she had, "in order to overcome the lack of an application for a position, she has not made the requisite presentation of overwhelming evidence of pervasive discrimination in all aspects of the employer's internal employment practices". *See Kreuzer*, 128 F.3d at 363 n. 2. Her assertion that Boeing has few women in management or supervisory positions, standing alone, is insufficient to demonstrate pervasive discrimination. *See Howard v. BP Oil Co., Inc.*, 32 F.3d 520, 524 (11th Cir.1994) (plaintiff must show the number of minorities that applied and were rejected); *Pouncy v. Prudential Ins. Co.*, 668 F.2d 795, 803–04 (5th Cir.1982) (plaintiff must show that the rejected minority applicants were qualified for the respective positions). Indeed, Lenihan herself was promoted on at least two occasions. As noted above, a plaintiff's subjective belief of discrimination, without more, is not evidence of discrimination. *See Nichols*, 81 F.3d at 42, *Douglass*, 79 F.3d at 1429; *Ray*, 63 F.3d at 434.

Due to Boeing's former practice of not posting available positions, Lenihan's failure to apply would be excused if she showed that there was an available position and that she expressed some interest in a promotion or that Boeing had some reason to consider her for the post. *See Kehoe,* 96 F.3d 1095. Lenihan, however, has not shown that Boeing had a reason or duty to consider her for the positions awarded to Svetz, Rozycki, or Berry. With respect to Rozycki's and Berry's promotions, because the positions were at a different location and in a different state—Alabama, coupled with Boeing's business practice of promoting from the same location, Lenihan has not demonstrated that Boeing had a duty or reason to consider her for these positions.

Moreover, Lenihan has not alleged or shown that she was qualified for the position awarded to Rozycki. In fact, as she admitted at deposition, she did not know what duties or expertise this position required. With respect to the Berry position, she concedes that he was "very well qualified" for the position. In the absence of her possessing superior qualifications, which she does not contend, an inference of sexual discrimination cannot arise, as Boeing had no duty to prefer her over a man. *See Burdine,* 450 U.S. at 259; *Sessions,* 648 F.2d at 1071; *Wynn,* 692 F.Supp. at 684. With regard to the two management positions in Huntsville for which Daily urged her to apply, Lenihan has failed to establish the fourth element of a *prima facie* case in that she has not demonstrated that Boeing promoted or continued to seek other candidates who were not women. Rather, Lenihan admitted that these positions ultimately were never filled by anyone and perhaps were not created due to budgetary constraints. To establish the fourth element, Lenihan must at least show that there was an available position. *See Goff,* 678 F.2d at 595; *see also Simon,* 642 F.2d at 755 n. 3. She had not done so here.

Finally, even if Lenihan had established the elements of a *prima facie* case, Boeing has set forth legitimate, nondiscriminatory reasons for not promoting Lenihan to the Berry and Rozycki positions. Thomas C. Peters ("Peters"), Human Resources Manager for Boeing's Huntsville operations, explained in his affidavit:

> By the time of these promotions, Lenihan was already working in Boeing's Houston operations on the prime contract with NASA. As a matter of consistently applied, neutral business practices, Lenihan, as an employee in the Houston operations, would not have been considered for these promotions. This is because in 1995, if Boeing Huntsville management had a reasonable expectation that there were sufficient local candidates to fill an opening in a first level management position, there would be no justification to look beyond that location for other candidates. This limitation to Huntsville served two purposes: (1) promotions from within a current workforce generally boosts employee morale, and (2) local promotions avoid relocation expenses. In the case of the Barry and Rozycki promotions, both Berry and Rozycki were working at the time in Huntsville, where the promotional opportunities arose. Management determined that they were qualified for the promotions.

Lenihan does not dispute the accuracy of Peters's affidavit. She simply asserts that Boeing's failure to promote her was discriminatory. This bald assertion is insufficient to rebut the legitimate, nondiscriminatory reasons set forth by Boeing. Indeed, Lenihan has failed to show either that Boeing's professed reasons were false or that Boeing's decisions were motivated by sexually discriminatory animus.

As a consequence, Lenihan cannot prevail on her failure to promote claim.

### c. Overtime

Lenihan also contends in her complaint that Boeing discriminated against her in that it provided Hicks a greater opportunity to work and be paid for overtime hours than she received.

Lenihan appears to have abandoned this claim, as she has presented no evidence or briefing in support of it. In any event, she has failed to establish a *prima facie* case with respect to this claim. She has not demonstrated that she requested to work

overtime or that Boeing refused this request. Further, she has failed to detail the extent to which Hicks's overtime hours exceeded her own. She also has not shown that she was available to work overtime hours when needed or that she was qualified to perform the work that Hicks performed on overtime.

Without some evidence on these points, Lenihan's overtime claim must be rejected. *See de la Cruz v. New York City Human Resources Admin.*, 82 F.3d 16, 23 (2d Cir. 1996).

### C. The Equal Pay Act and Pay Discrimination Under Title VII

#### 1. Statute of Limitations

Boeing contends that Lenihan cannot recover under the EPA for any disparities in pay which occurred beyond two years prior to the institution of this lawsuit. Similarly, Boeing maintains that Lenihan cannot recover for any disparities which occurred more than two years before she filed her charge of discrimination with the EEOC.

■ Under the EPA, an action must be commenced within two years of its accrual, or within three years if the violation was willful. *See* 29 U.S.C. § 255(a). A defendant's violation of the EPA is willful or reckless within the meaning of the Act if "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *Reich v. Waldbaum, Inc.*, 52 F.3d 35, 39 (2d Cir. 1995) (quoting *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988)). A plaintiff need not show that the employer acted with intent to discriminate or with bad faith. *See Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 126 n. 19, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985). When an employer is accused of an ongoing practice that began prior to the statute of limitations period, the claim may still be timely under the continuing violation doctrine if a present violation exists. *See Ashley v. Boyle's Famous Corned Beef Co.*, 66 F.3d 164, 167–68 (8th Cir.1995); *Brinkley–Obu v. Hughes Training, Inc.*, 36 F.3d 336, 347 (4th Cir.1994); *Mitchell v. Jefferson County Bd. of Educ.*, 936 F.2d 539, 548 (11th Cir.1991)

(citing *Hodgson v. Behrens Drug Co.*, 475 F.2d 1041, 1050 (5th Cir.1973), *cert. denied*, 414 U.S. 822, 94 S.Ct. 121, 38 L.Ed.2d 55 (1973)). "To hold otherwise would permit perpetual wage discrimination by an employer whose violation of the Equal Pay Act had already lasted without attack for over two years." *Hodgson*, 475 F.2d at 1050; *see also Corning Glass Works v. Brennan*, 417 U.S. 188, 208–10, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974). A plaintiff who prevails under the EPA, however, may recover for pay disparities only within two years of commencing the action, or within three years if the violation was willful. *See Ashley*, 66 F.3d at 168; *Gandy v. Sullivan County*, 24 F.3d 861, 865 (6th Cir.1994).

■ With regard to Title VII, "[a] plaintiff who alleges pay discrimination under Title VII is entitled to recover back pay for a period beginning not more than two years before the filing of the EEOC claim." *Merrill*, 806 F.2d at 606 (citing *Sellers v. Delgado College*, 781 F.2d 503, 505 (5th Cir.1986)); *see Lusted v. San Antonio Indep. Sch. Dist.*, 741 F.2d 817, 822 (5th Cir.1984). This constitutes a limit on liability, not a statute of limitations, and has been interpreted only as a cap on the amount of back pay that may be awarded under Title VII. *See Bereda v. Pickering Creek Indus. Park, Inc.*, 865 F.2d 49, 54 (3d Cir.1989); *Kornegay v. Burlington Indus., Inc.*, 803 F.2d 787, 788 (4th Cir.1986); *Laffey v. Northwest Airlines, Inc.*, 740 F.2d 1071, 1094 (D.C.Cir.1984), *cert. denied*, 469 U.S. 1181, 105 S.Ct. 939, 83 L.Ed.2d 951 (1985); *see also Albemarle Paper Co. v. Moody*, 422 U.S. 405, 410 n. 3, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). The continuing violation theory, if applicable, may be utilized with regard to pay discrimination claims brought under Title VII, as well as under the EPA, but recovery is still limited to the two years preceding the charge. *See Ashley*, 66 F.3d at 167–68; *Brinkley–Obu*, 36 F.3d at 347.

Here, Lenihan filed charges with the EEOC on November 16, 1995, and commenced this lawsuit on May 16, 1996. Lenihan has adduced sufficient evidence of a continuing pay disparity dating from the early 1990s to the present to permit her to rely on

the continuing violation theory under both the EPA and Title VII.

Accordingly, summary judgment on limitations grounds is not warranted with respect to these claims.

### 2. *Prima Facie Case*

■ As noted above, Title VII prohibits discrimination in compensation based on an individual's sex. *See* 42 U.S.C. § 2000e–2(a)(1). Under the EPA, an employer is prohibited from discriminating "between employees on the basis of sex by paying wages to employees in such establishment ... for equal work on jobs the performance of which requires equal skill, effort and responsibility, and which are performed under similar working conditions ...." 29 U.S.C. § 206(d)(1). An unequal pay claim is generally analyzed under the same standard, whether the claim is brought under Title VII or the EPA. *See Gunther,* 452 U.S. at 168; *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1312 (2d Cir.1995); *EEOC v. J.C. Penney Co., Inc.,* 843 F.2d 249, 252 (6th Cir.1988). Unlike an EPA claim, however, to prevail on a wage discrimination claim under Title VII, the plaintiff must prove that the employer acted with discriminatory intent. *See Tomka,* 66 F.3d at 1313; *Meeks v. Computer Assoc. Int'l,* 15 F.3d 1013, 1019 (11th Cir.1994); *Peters v. City of Shreveport,* 818 F.2d 1148, 1153–54 (5th Cir. 1987), *cert. dismissed,* 485 U.S. 930, 108 S.Ct. 1101, 99 L.Ed.2d 264 (1988).

■ For purposes of the EPA, generally "the term 'establishment' ... refers to a distinct physical place of business rather than to an entire business or 'enterprise' which may include several separate places of business." 29 C.F.R. § 1620.9(a). "Accordingly, each physically separate place of business is ordinarily considered a separate establishment." *Id.* "Under appropriate circumstances," however, "multiple offices may constitute a single establishment for EPA purposes." *Meeks,* 15 F.3d at 1017; *see, e.g., Marshall v. Dallas Indep. Sch. Dist.,* 605 F.2d 191, 194 (5th Cir.1979) (school district with 182 schools is a single establishment); *Brennan v. Goose Creek Consol. Indep. Sch. Dist.,* 519 F.2d 53, 57 (5th Cir. 1975) (school district operating 13 schools is

a single establishment); *AFSCME v. County of Nassau,* 609 F.Supp. 695, 705–07 (E.D.N.Y.1985) (entire county may constitute a single establishment); *Grumbine v. United States,* 586 F.Supp. 1144, 1147–48 (D.D.C.1984) (the entire federal civil service is a single establishment). "There is a trend in the law wherein an 'establishment' includes all places of business of one corporation or a multi-location employer ...." *Brownlee v. Gay & Taylor, Inc.,* 642 F.Supp. 347, 350 (D.Kan.1985). Rather than relying on the single factor of geography, courts take into account several factors including the degree of centralized management of job descriptions, salary administration, and job assignments; the degree to which physically separate places of business interact; the interchange of work locations; and the degree to which employees at separate locations perform the same functions. *See Mulhall v. Advance Sec., Inc.,* 19 F.3d 586, 591 (11th Cir.), *cert. denied,* 513 U.S. 919, 115 S.Ct. 298, 130 L.Ed.2d 212 (1994); *Meeks,* 15 F.3d at 1017; *Marshall,* 605 F.2d at .194.

> [U]nusual circumstances may call for two or more distinct physical portions of a business enterprise being treated as a single establishment. For example, a central administrative unit may hire all employees, set wages, and assign the location of employment; employees may frequently interchange work locations; and daily duties may be virtually identical and performed under similar working conditions. Barring unusual circumstances, however, the term "establishment" will be applied as described in subsection (a) of this section.

29 C.F.R. § 1620.9(b). Therefore, unless unusual circumstances are demonstrated, multiple offices generally are presumed not be a "single establishment." *See Meeks,* 15 F.3d at 1017 (citing 29 C.F.R. § 1620.9(a)).

■ To establish a *prima facie* case under the EPA, a plaintiff must show that:

(1) his or her employer is subject to the Act;

(2) he or she performed work in a position requiring equal skill, effort, and

responsibility under similar working conditions; and

(3) he or she was paid less than the employee of the opposite sex providing the basis of comparison.

*See Chance v. Rice University,* 984 F.2d 151, 153 (5th Cir.1993); *Peters,* 818 F.2d at 1153; *Jones,* 793 F.2d at 722–23. "A showing of 'equal work' requires only that the plaintiff prove that the 'skill, effort, and responsibility' required in the performance of the jobs compared are substantially equal." *Peters,* 818 F.2d at 1153 (quoting *Jones,* 793 F.2d at 723); *see Hodgson,* 475 F.2d at 1049. Unlike a claim arising under Title VII, however, the plaintiff asserting a claim under the Equal Pay Act need not demonstrate discriminatory intent. *See Tomka,* 66 F.3d at 1310; *Meeks,* 15 F.3d at 1019; *Peters,* 818 F.2d at 1153.

The EPA is also dissimilar to Title VII in that, if the plaintiff succeeds in establishing a *prima facie* case, the burdens of production and persuasion shift to the employer to demonstrate as an affirmative defense that the difference in wages is justified by one of the exceptions specified under the Act. *See Corning Glass Works,* 417 U.S. at 196; *Peters,* 818 F.2d at 1153; *Jones,* 793 F.2d at 722; *Plemer v. Parsons–Gilbane,* 713 F.2d 1127, 1136 (5th Cir.1983).

Once the plaintiff shows that he or she is paid less than an employee of the opposite sex for substantially equal work, the burden of proof shifts to the employer to show that the differential is justified under one of the Act's four exceptions.

*Peters,* 818 F.2d at 1153 (quoting *Corning Glass Works,* 417 U.S. at 196). The EPA provides exceptions for disparate wage payments made pursuant to:

(1) a seniority system;

(2) a merit system;

(3) a system which measures earnings by quantity or quality of production; or

(4) a differential based upon any other factor other than sex.

*See* 29 U.S.C. § 206(d)(1); *see also Peters,* 818 F.2d at 1153; *Plemer,* 713 F.2d at 1136; *Tarango v. Johnson & Johnson Medical, Inc.,* 949 F.Supp. 1285, 1289 (W.D.Tex.1996).

To prevail on the fourth exception, the employer must show that sex provided "no part of the basis for the wage differential." *See Peters,* 818 F.2d at 1154. Factors other than sex upon which an employer may properly rely include " 'unique characteristics of the same job; ... an individual's experience, training or ability; or ... special exigent circumstances connected to the business.' " *Irby v. Bittick,* 44 F.3d 949, 955 (11th Cir. 1995) (quoting *Glenn v. General Motors Corp.,* 841 F.2d 1567, 1571 (11th Cir.), *cert. denied,* 488 U.S. 948, 109 S.Ct. 378, 102 L.Ed.2d 367 (1988)). While the prior salary of an employee may also be considered in connection with other factors, prior salary, standing alone, cannot justify a disparity in pay. *See Irby,* 44 F.3d at 955; *Price v. Lockheed Space Operations Co.,* 856 F.2d 1503, 1506 (11th Cir.1988); *see also Kouba v. Allstate Ins. Co.,* 691 F.2d 873, 877–78 (9th Cir.1982). If the employer fails to carry its burden under the EPA, the plaintiff will prevail by reason of her *prima facie* case. *See Meeks,* 15 F.3d at 1019 ("If the evidence is in equipoise on the issue of whether a salary differential is based on a 'factor other than sex,' the plaintiff is entitled to judgment on her EPA claim"); *Tidwell v. Fort Howard Corp.,* 989 F.2d 406, 409 (10th Cir.1993).

As to Lenihan's pay discrimination claim under Title VII, the Supreme Court's disparate treatment cases, such as *McDonnell Douglas* and *Burdine,* provide " 'the appropriate framework for evaluating [a] claim of gender-based wage discrimination.' " *Meeks,* 15 F.3d at 1018–19 (quoting *Miranda v. B & B Cash Grocery Store, Inc.,* 975 F.2d 1518, 1528 (11th Cir.1992)). Thus, to establish a *prima facie* case under Title VII, the plaintiff must show that he or she occupies a job similar to that of higher paid workers of the opposite sex. *See id.* at 1019; *Miranda,* 975 F.2d at 1529. Once a *prima facie* case is established, the defendant must articulate a " 'legitimate, non-discriminatory reason for the pay disparity.' " *Meeks,* 15 F.3d at 1019 (quoting *Miranda,* 975 F.2d at 1529 (citing *Burdine,* 450 U.S. at 255–56)). "This burden is 'exceedingly light'; the defendant must merely proffer non-gender based reasons, not prove them." *Id.* (citing

*Miranda,* 975 F.2d at 1529 (quoting *Perryman v. Johnson Prod. Co., Inc.,* 698 F.2d 1138, 1142 (11th Cir.1983))). Once such a justification is advanced, the plaintiff must demonstrate by a preponderance of the evidence that the employer had a discriminatory intent. *See id.* In other words, the plaintiff must show that "'a discriminatory reason more likely than not motivated [the employer] to pay her less.'" *Id.* (quoting *Miranda,* 975 F.2d at 1529) (citing *Burdine,* 450 U.S. at 256)). The plaintiff has the ultimate burden to prove that sex is a significant factor in the employer's wage differentials. *See Peters,* 818 F.2d at 1154. Such proof may be direct or circumstantial. *See Meeks,* 15 F.3d at 1019; *EEOC v. Reichhold Chem., Inc.,* 988 F.2d 1564, 1570 (11th Cir.1993). Under Title VII, the burden of persuading the trier of fact that the differential in pay is due to the employer's intentional sex discrimination remains with the plaintiff at all times. *See Peters,* 818 F.2d at 1154; *see also Meeks,* 15 F.3d at 1019.

 Under either the EPA or Title VII, the plaintiff need not prove that she was paid less than every comparable male employee. *See Merrill v. Cintas Corp.,* 941 F.Supp. 1040, 1044 n. 4 (D.Kan.1996). It is enough for the plaintiff to show that there is discrimination in pay with respect to one employee of the opposite sex. *See EEOC v. White & Son Enter.,* 881 F.2d 1006, 1009 (11th Cir.1989). The issue of whether two or more jobs require equal work for EPA purposes is decided on a case-by-case basis. *See Brobst v. Columbus Serv. Int'l,* 761 F.2d 148, 156 (3d Cir.1985). The relevant comparison is between the jobs and not the people holding them. *See Mulhall,* 19 F.3d at 592. "Only the skills and qualifications actually needed to perform the jobs are considered." *Id.* Although position titles or descriptions should be considered, these are not determinative without corroborating evidence of actual job content. *See id; see also EEOC v. Sears, Roebuck & Co.,* 839 F.2d 302, 346 (7th Cir.1988). The central issue is job content and not the name under which the position was classified. *See Brobst,* 761 F.2d at 155.

 As noted above, under the EPA, the jobs that are being compared need only be substantially equal, not identical. *See Tomka,* 66 F.3d at 1310; *Lambert v. Genesee Hosp.,* 10 F.3d 46, 56 (2d Cir.1993), *cert. denied,* 511 U.S. 1052, 114 S.Ct. 1612, 128 L.Ed.2d 339 (1994); *Peters,* 818 F.2d at 1153; *EEOC v. Central Kan. Med. Ctr.,* 705 F.2d 1270, 1272 (10th Cir.1983). The standard of equal work, however, is not met if the jobs are "merely comparable." *Tomka,* 66 F.3d at 1310; *Lambert,* 10 F.3d at 56.

> Whether two jobs entail equal skill, equal effort, or equal responsibility requires practical judgment on the basis of all the facts and circumstances of a particular case. Skill includes such considerations as experience, training, education, and ability. Effort refers to the physical or mental exertion necessary to the performance of a job. Responsibility concerns the degree of accountability required in performing a job.

*McLaughlin v. Esselte Pendaflex Corp.,* 50 F.3d 507, 513 (8th Cir.1995). In contrast, "Title VII incorporates a more relaxed standard of similarity between male and female-occupied jobs." *Miranda,* 975 F.2d at 1529 n. 11. Thus, under Title VII, the "plaintiff is not required to meet the exacting standard of substantial equality of positions set forth in the Equal Pay Act." *Id.; see Gunther,* 452 U.S. at 178–79, 181; *Merrill,* 806 F.2d at 606; *Plemer,* 713 F.2d at 1132; *see also Sprague v. Thorn Americas, Inc.,* 129 F.3d 1355, 1362 (10th Cir.1997). In *Gunther,* the Supreme Court specifically rejected the notion that "only those sex-based wage discrimination claims that satisfy the 'equal work' standard of the Equal Pay Act could be brought under Title VII." 452 U.S. at 178. To be actionable under Title VII, the work performed by the female employee need only be similar or comparable to that of a higher paid male employee. *See Meeks,* 15 F.3d at 1019; *Miranda,* 975 F.2d at 1529; *Merrill,* 806 F.2d at 606.

 A common method of analysis under the EPA is to determine initially whether the jobs to be compared have a common core of tasks, *i.e.,* whether a significant portion of the two jobs is identical. Then, it must be ascertained whether the differing or additional tasks make the work substantially dif-

ferent. *See Brobst,* 761 F.2d at 156. Jobs may be equal even though one sex is given extra duties if the other sex also performs extra duties of equal skill, effort, and responsibility or if the extra duties take little time and are only of peripheral importance. *See Central Kan. Med. Ctr.,* 705 F.2d at 1272. Ultimately, whether two jobs "require equal skill, effort, and responsibility, and are performed under similar working conditions is a factual determination." *Fallon v. State of Illinois,* 882 F.2d 1206, 1208 (7th Cir.1989). "Given the fact intensive nature of the inquiry, summary judgment will often be inappropriate." *Brobst,* 761 F.2d at 156.

■ Clearly, Boeing is an "employer" under the Equal Pay Act. *See* 29 U.S.C. § 203(d) (defining "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee . . ."); *see also Welch v. Laney,* 57 F.3d 1004, 1010 (11th Cir.1995); *Wirtz v. Lone Star Steel Co.,* 405 F.2d 668, 669 (5th Cir.1968). As to the relevant "establishment," Lenihan has submitted evidence suggesting that Boeing's Huntsville and Houston operations may be viewed as a single establishment for purposes of the EPA. She has put forth evidence that the two sites were functionally interrelated in that employees and entire work groups were transferred between the two sites, employees from one site were asked to apply for positions at the other location, she was transferred to Houston from the Huntsville site, a common classification system is used to classify employees, and the same general criteria are used to evaluate employees. Further, Lenihan has produced evidence that there was some commonality of administration, one of her supervisors in Huntsville—Garner—also supervised her in Houston, her duties at both locations were similar and were performed under similar working conditions, and both sites produced similar products. *See* 29 C.F.R. § 1620.9(b); *Marshall,* 605 F.2d at 194; *Goose Creek Consol. Indep. Sch. Dist.,* 519 F.2d at 57. Hence, Lenihan has adduced sufficient evidence to raise a fact issue as to the scope of the applicable "establishment" to be considered when assessing her claims under the EPA.

■ As to the second element of a *prima facie* case under the EPA, Lenihan has brought forward evidence indicating that she performed work in a position requiring equal skill, effort, and responsibility under similar working conditions as that of a male employee. In this instance, Lenihan maintains that all of the members of the equipment management group in 1993 had forty-one duties assigned to them. Lenihan was allegedly the group "lead," which entailed additional duties and required greater experience. This group was comprised of Lenihan and three males— Hicks, Mohammed Elkhouli ("Elkhouli"), and Eudon Thomas ("Thomas")—along with Garner, their supervisor. While Boeing argues that Lenihan's position was dissimilar to those of her comparators, the jobs to be compared are required to be substantially equal, not identical. *See Tomka,* 66 F.3d at 1310; *Lambert,* 10 F.3d at 56; *Peters,* 818 F.2d at 1153; *Central Kan. Med. Ctr.,* 705 F.2d at 1272. Here, Lenihan has presented sufficient evidence suggesting substantial equality to raise a question of fact with regard to this issue.

As to the third element of a *prima facie* case, Lenihan has demonstrated that her annual salary in 1993 was $33,200. Subsequently, it increased over time to $44,150. Despite this increase, her present salary still falls short of Elkhouli's 1993 annual salary of $46,900. Further, Elkhouli's current salary is $55,550, an amount which substantially surpasses Lenihan's. Similarly, Hicks's annual starting salary was $50,000 in 1990; it increased to $58,350 in 1993 and is currently $69,900. Although Hicks differs from Lenihan in that he possesses a college degree and has a different job title, he is at the same grade classification as Lenihan, J7/Grade 52. Lenihan has also shown that William Bourgeois ("Burgeois") was hired by Boeing at the J7/grade 52 level in January 1996. Despite the parity in grade level between Bourgeois and Lenihan, Burgeois's annual starting salary was $60,600, and his current salary is $64,000. Thus, if their jobs are substantially equal, Lenihan has established the third element of a *prima facie* case.

■ Under the EPA, if Lenihan can establish a *prima facie* case, the burdens of

production and persuasion shift to Boeing to demonstrate as an affirmative defense that the differences in pay are justified by one of the four exceptions specified under the Act. *See Corning Glass Works,* 417 U.S. at 196; *Peters,* 818 F.2d at 1153. To satisfy its burden, Boeing must show by a preponderance of the evidence that the wage differential is a result of one of the factors enumerated in the EPA. *See Meeks,* 15 F.3d at 1018; *Fowler v. Land Management Groupe, Inc.,* 978 F.2d 158, 161 (4th Cir.1992). Under Title VII, however, Boeing merely has the burden of production. *See Brinkley–Obu,* 36 F.3d at 344; *Meeks,* 15 F.3d at 1019. Boeing contends that any salary disparities that exist are justified by legitimate factors other than gender. Specifically, it argues that Boeing's allegedly systematic and objective merit system has created legitimate disparities. Boeing further contends that any pay differences are due to differences between Lenihan and her comparators in education and work experience. For example, Boeing points out that many of Lenihan's comparators have college degrees, while Lenihan does not. Boeing also notes that Lenihan's prior salary history distinguishes her from her comparators. As evidence that legitimate factors other than gender created the pay disparities, Boeing relies on the reports of Dr. Mary Baker, a Ph.D. economist with expertise in statistical analyses, and Dr. Richard Jeanneret, who has a Ph.D. in industrial psychology and expertise in employee assessment. Boeing's evidence, while raising a fact issue, fails to establish as a matter of law that a legitimate factor other than sex accounts for the pay disparities between Lenihan and her male counterparts if their jobs are indeed substantially similar.

Moreover, Lenihan has proffered evidence that she was paid less than a male employee occupying a similar job, as necessary to establish a *prima facie* case under Title VII. Although Boeing has articulated legitimate, nondiscriminatory reasons for the pay differentials, Lenihan has satisfied her burden of raising a genuine issue of fact with regard to pretext and discriminatory animus. Specifically, she has presented evidence of comments allegedly made and actions reportedly taken by her former supervisors—Lewis White, Hardy, and Garner, a remark purportedly made by a Boeing human resources representative—MacCrone, and an excerpt from a Boeing information bulletin. The Boeing Information Bulletin, Puget Sound Edition, dated March 4, 1996, states in part that certain Boeing departments suffer from "statistically significant differences in pay ... between men and women." At her deposition, Lenihan testified that MacCrone acknowledged to her that Boeing had committed EEO violations. She further testified that Garner informed her that "there was extra money to be allocated for pay raises ... to get the women in line with the men." Lenihan has also adduced evidence casting doubt on whether Boeing followed its merit system guidelines in awarding pay increases to her. Under these circumstances, Lenihan has proffered adequate evidence from which intentional sex discrimination could be inferred.

Accordingly, with respect to Lenihan's disparate pay claims under the EPA and Title VII, there exist outstanding issues of material fact precluding summary judgment.

### D. Breach of Contract

Lenihan contends that Boeing breached an oral contract in which it agreed to double her salary increases in order to correct disparities between her pay and that of her male counterparts. Specifically, she alleges that Hardy, her supervisor in Huntsville, "promised to fight hard" to obtain for Lenihan double or substantial annual increases. According to Lenihan, when she received substantial increases in pay, Hardy informed Lenihan that he was responsible for the increases. Lenihan admits, however, that Hardy did not promise to increase her salary by a specific amount and that this alleged agreement was never reduced to writing. The parties agree that, because the purported contracted was formed in Alabama, Alabama law governs Lenihan's breach of contract claim.

Boeing argues that Hardy's alleged statements lack the specificity, certainty, and definiteness required to establish the existence of a contract. "Under Alabama law, to

render the contract valid, the agreement of the parties as expressed in the offer and acceptance must be certain and explicit and their full intention ascertainable to a reasonable degree of certainty." *Erika, Inc. v. Blue Cross & Blue Shield,* 496 F.Supp. 786, 787–88 (S.D.Ala.1980). Their agreement must be neither vague nor indefinite. *See Dillon v. AFBIC Dev. Corp.,* 420 F.Supp. 572, 576 (S.D.Ala.1976), *aff'd in part and rev'd in part on other grounds,* 597 F.2d 556 (5th Cir.1979). A contract will not be enforced where it is so "vague and indefinite in terms that the intention of the parties cannot be fairly and reasonably collected from them." *Alabama Nat'l Life Ins. Co. v. National Union Life Ins. Co.,* 275 Ala. 28, 151 So.2d 762, 766 (1963); *see also Mobil Oil Corp. v. Schlumberger,* 598 So.2d 1341, 1345 (Ala.1992); *Muscle Shoals Aviation, Inc. v. Muscle Shoals Airport Auth.,* 508 So.2d 225, 228 (Ala.1987); *Alexander v. Petroleum Installation Co., Inc.,* 695 So.2d 30, 31 (Ala.Civ. App.1996). " '[A]n agreement to be binding must be definite and certain,' and 'must be sufficiently definite to enable the court to determine its exact meaning and fix definitely the legal liability of the parties.' " *Poultry Haulers, Inc. v. Pillsbury Co.,* 247 F.Supp. 556, 557 (N.D.Ala.1964) (quoting *Alabama Nat'l Life Ins. Co.,* 151 So.2d at 766), *aff'd,* 353 F.2d 538 (5th Cir.1965). "[A] trial court should not attempt to enforce a contract whose terms are so indefinite, uncertain, and incomplete that the reasonable intentions of the contracting parties cannot be fairly and reasonably distilled from them." *Cook v. Brown,* 393 So.2d 1016, 1018 (Ala.Civ.App. 1981); *see also Smith v. Chickamauga Cedar Co.,* 263 Ala. 245, 82 So.2d 200, 203 (1955); *Mozley v. Boen,* 41 Ala.App. 596, 143 So.2d 304, 304 (1962).

■ Here, the alleged statements at issue are vague and indefinite. A promise to "fight hard to obtain double or substantial salary increases" does not convey a certain, determinable meaning. It is subject to a broad range of equally-plausible interpretations. The statements cannot form the basis for judicial relief, as they provide no measure for damages in the event of breach. In short, the statements Lenihan attributes to Hardy are unenforceable as a contract because they are so vague and indeterminate that the intention of the parties cannot be ascertained.

Consequently, Lenihan's breach of contract claim is without merit.

### III. *Conclusion*

Accordingly, Boeing's motion for summary judgment is GRANTED with respect to Lenihan's Title VII sexual discrimination claims for failure to promote, failure to provide overtime, and sexual harassment as well as her breach of contract claim. Summary judgment is DENIED, however, as to Lenihan's claims of unequal pay under the EPA and pay discrimination under the EPA and Title VII. Therefore, Lenihan may proceed to trial on the latter claims.

**IT IS SO ORDERED.**